231 P.3d 1211 (2010)
155 Wash.App. 48
Sue COLLINS and Valerie Larwick, Respondents and Cross Appellants,
Helen Hayden and Kristy Mason, Plaintiffs,
v.
CLARK COUNTY FIRE DISTRICT NO. 5 and Marty James, Appellants and Cross Respondents,
City of Vancouver and County of Clark, Defendants.
No. 36968-1-II.
Court of Appeals of Washington, Division 2.
March 11, 2010.
As Correct on Denial of Reconsideration April 20, 2010.
*1215 Edwin Arthur Harnden, Attorney at Law, Portland, OR, Daniel G. Lloyd, City of Vancouver Attorneys Office, Dennis Hunter, Attorney at Law, Vancouver, WA, for Defendants.
Michael Alexander Patterson, Daniel Paul Crowner, Patterson Buchanan Fobes Leitch & Kalzer, Seattle, WA, Elizabeth M. Alvarado, Willette & Guerra LLP, McAllen, TX, for Appellants/Cross-Respondents.
Thomas Stephenson Boothe, Attorney at Law, Portland, OR, for Respondents/Cross-Appellants.
HUNT, J.
ś 1 Defendants Clark County Fire District No. 5 and Marty James appeal the trial court's denial of their motions for a new trial and partial denial of their motions for remittitur to redetermine the jury's damages awards for Plaintiffs Sue Collins, Valerie Larwick, Kristy Mason, and Helen Hayden's gender discrimination, sexual harassment, and negligent supervision claims. Defendants argue that (1) substantial evidence failed to support the jury's damages awards to Collins and Larwick; (2) during closing argument, Plaintiffs' counsel improperly sent a message to the jury and improperly referenced insurance, causing the jury to base its damages award on passion and prejudice; and (3) in calculating Plaintiffs' attorney fees award, the trial court abused its discretion by setting the lodestar hourly rate at more than $225 and failing to subtract legal assistant time and non-compensable attorney time.
ś 2 Collins and Larwick cross-appeal. They argue that the trial court abused its discretion in awarding insufficient attorney fees to all four Plaintiffs, specifically by setting the lodestar below the customary hourly rate, failing to apply a separate contingency multiplier to the lodestar, and refusing to award miscellaneous amounts for overhead costs. Larwick additionally argues that the trial court erred in remitting and reducing her jury awards for economic and non-economic damages.
ś 3 We affirm the trial court's denial of Defendants' motions for a new trial and partial denial of their motions for remittitur to redetermine the jury's damages awards. We reverse the trial court's remittitur reduction of Larwick's jury awards for economic and non-economic damages and remand to the *1216 trial court for reinstatement. In addition, we reverse the trial court's remittitur reduction of Larwick's jury award for non-economic damages and remand to the trial court to reinstate this award to her. We affirm the trial court's attorney fees awards to all four Plaintiffs. And we award attorney fees and costs on appeal to Collins and Larwick.

FACTS

I. Plaintiffs' Claims

A. Background
ś 4 In 1999, former Clark College first aid and health care instructor Valerie Larwick developed an idea to form a regional training center to establish emergency medical programs and to localize these resources for area fire districts. Clark County Fire District No. 5 (Fire District) then formed the Northwest Regional Training Center ("Training Center") to accomplish these objectives. The Fire District operated the Training Center under an interlocal agreement with the City of Vancouver. This interlocal agreement enabled the Training Center to function like an independent contractor in providing first aid courses, paramedic training, and emergency healthcare instruction; and it provided for the Fire District to "retain all authority for provision of services, standards of performance, discipline and control of personnel." Clerk's Papers and Supplemental Clerk's Papers (CP) at 1090.
ś 5 In establishing the Training Center, the Fire District hired retired assistant fire chief Marty James to serve as the facility's manager and chief administrator. In this capacity, James assembled agendas for the Fire District's Board of Commissioners' meetings, served as the Fire District's human resources contact, supervised Training Center employees and operations, and exercised authority over employee salaries, promotion and demotion decisions, and employee performance reviews. In the spring of 2000, Larwick began volunteering at the Training Center; and in June, the Fire District hired her as the Training Center's full-time program director. The Fire District then hired Helen Hayden in July and Kristy Mason in December 2001.[1] Sue Collins, a City public works department employee, began working part time at the Training Center in November 2000; and the City transferred her to work full-time at the Training Center in January 2002. Unlike Larwick, Hayden, and Mason who received salaries from the Fire District, Collins remained on the City's payroll during her employment at the Training Center.

B. James's Sexually Harassing and Discriminatory Treatment of Subordinate Female Employees
ś 6 During their employment at the Training Center, Larwick, Collins, Mason, and Hayden experienced James's sexually inappropriate comments and purposeful discrimination of female employees. For example, James regularly commented in their presence about the anatomy of female passersby, saying, "[N]ice legs," and "[N]ice rack." 5 Record of Proceedings (RP) at 641, 7 RP at 963, and 12 RP at 1805. Similarly, James commented on the anatomy of female employees, often discussing or comparing their breasts within the hearing range of other employees and visitors. James repeatedly remarked to Larwick and other female employees about "ladies' nipples getting hard," 2 RP at 239-40, asking, "Is it cold in here, or are you happy to see me?" 7 RP at 964. And when female employees would bend down to pick up an object in front of James, he often said such things as, "Looks good from here," or "That's how I like them, you know, down on their knees." 9 RP at 1217.
ś 7 In addition, James subjected female employees to a "boy's club" atmosphere and a "very purposeful exclusion" from staff meetings and conversations. 17 RP at 2484-85. He frequently said, "We need more testosterone *1217 around here," while grabbing his crotch in front of Training Center personnel. 7 RP at 914 and 972. In conversations with Training Center personnel, James frequently described Collins and Larwick and other female employees as "stupid wom[e]n," "stupid bitch[es]," and "lying bitch[es]." 5 RP at 641 and 7 RP at 973, 13 RP at 1975. And when James disagreed with a female employee, he often made comments such as, "[s]he must be PMSing," or "[w]ho's on the rag." 7 RP at 971, 9 RP at 1199, and 17 RP at 2472.

1. James's sexually harassing and discriminatory treatment of Larwick
ś 8 Furthermore, Larwick and others noticed that James's sexist and demeaning conduct often targeted Larwick. He referred to Larwick as "a fucking cunt" and "a stupid bitch," 12 RP at 1730-31; and, on one occasion, he told Collins that Larwick "doesn't have any panties on" under her pants. 12 RP at 1734. James also told Larwick he could see her panties through her slacks. On another occasion, James put a wind-up penis toy next to Larwick and laughed as it began hopping around her desk, even when he knew that Larwick had recently endured a family crisis, involving her then husband's sexual molestation of her daughter.
ś 9 In response to James's daily jokes and sexual innuendos, Larwick tried to ignore his remarks and to stay out of his way. Although she observed that James's sexually harassing and sexist conduct made it difficult for her and other female employees to work, she did not report her concerns to the Fire District's human resources department because James served as the Training Center's human resources contact person.[2]
ś 10 But when Larwick saw City fire department Chief Don Bivins at the Training Center's 2000 Christmas party, she decided to tell him about how James's "harassing comments" and constant "attacks" created "a toxic work environment" at the Training Center. 8 RP at 991. Bivins responded, "I'll try to steer [James] away from you." 8 RP at 992.
ś 11 After several months of hearing no word from Bivins and seeing no improvement in James's behavior, Larwick met again with Bivins to discuss her concerns. At the end of their conversation, Bivins promised to take care of the situation. But just as before, Larwick received no word from him after their meeting, nor did she see any improvement in James's behavior. To the contrary, she observed that reporting James to Bivins seemed to intensify James's hostility toward her.
ś 12 Larwick next called Fire District Board of Commissioners Chairman Robert Torrens to discuss James's sexually harassing and demeaning comments. Torrens offered to meet her at the Training Center, but she refused, explaining, "I feel safer away from the training center." 8 RP at 997. Larwick and Torrens then met at a different location, and she told him about James's hostility, sexual harassment, and sexist treatment of female subordinates. She also told Torrens that James's "disgusting comments," such as, "[w]e need more testosterone around here," did not reflect well on the Fire District's public image. 8 RP at 998. Torrens replied, "Well, that's Marty. You know, Val, that's just Marty." 8 RP at 999.
ś 13 Although Torrens "brought up the issue" at the next Board of Commissioners' meeting and spoke to James about it, James's conduct toward Larwick only became worse. 8 RP at 1000. Larwick observed that Torrens, like Bivins, was giving her "the cold shoulder." 8 RP at 1001. Around this time, Training Center employees noticed that James's "disparaging" treatment of Larwick became "worse and worse." 9 RP at 1189 and 1243. He "was constantly making very derogatory comments about [her]." 9 RP at 1243. He told Hayden that Larwick "had gone behind his back and cut his sac and that nobody would ever, ever do that." 9 RP at 1189-90. According to Hayden, James was "furious" that Larwick had *1218 reported his conduct to Torrens, 9 RP at 1189, and James had "an out and out vendetta against [her]." 9 RP at 1243. James also threatened Larwick "every other day, if not daily," telling her, "You need to shut up," and, "You stop talking about [ ] me in a negative way." 8 RP at 1009.
ś 14 Around this time, Larwick contacted Patricia Kellogg, a counselor with whom she had previously met at the Training Center, to discuss the situation with James.[3] Larwick told Kellogg about James's hostility toward her and his habit of making sexual jokes and comments about female subordinates. In August 2001, Larwick met again with Kellogg, primarily to discuss the molestation incident in her family. Larwick explained to Kellogg that this incident, and her subsequent divorce, caused her depression and anxiety. Larwick added that her family situation, in addition to "the ongoing onslaught of harassment" at the Training Center, caused her to lose a significant amount of weight. 8 RP at 1042.
ś 15 Also around this time, Larwick recommended that James hire Gregg Ramirez to lead the Training Center's paramedic program because Ramirez had a bachelor's degree and experience teaching EMT courses. Larwick and James had previously discussed finding someone with a bachelor's degree to lead the program because their agreement with Clark College obligated the Training Center to hire someone with a bachelor's degree. Based on Larwick's recommendation, James and the Fire District hired Ramirez.
ś 16 Shortly thereafter, James told Larwick that the Training Center lacked sufficient funds to pay her salary in addition to Ramirez's salary, saying, "[W]e're going to have to cut your hours," and, "[W]e don't have the funds." 8 RP at 1052. Larwick asked James, "Does that mean cut my pay?" James replied, "Yes," and left the room. 8 RP at 1053. Larwick later approached James and told him that she could not afford to lose her job and that she hoped to work at least part time and to retain full benefits. James responded, "We're just going to have to let you go. Youâ you can have the rest of the month off. Consider it administrative leave." 8 RP at 1053. He also told her to pack up her things and to leave the building. When the Fire District terminated Larwick on October 31, she had worked at the Training Center for 28 months and impressed co-workers and supervisors with her hard work and "professionalism." 8 RP at 1156.
ś 17 The day after Larwick's termination, she met with Kellogg to seek counseling for "how bad [she] felt." 8 RP at 1109. She also met with Kellogg several times during the following months to discuss how the Training Center's hostile work environment had caused her to suffer from persisting mental health problems. Despite these ongoing mental health problems, Larwick searched for a new source of employment until she injured her knee in a ski accident, for which she underwent surgery. In June 2003, after receiving unemployment compensation for several months, she began working at her new husband's tree farm, where she earned an income "off and on," depending on the season. 8 RP at 1105.

2. James's sexually harassing and discriminatory treatment of Collins
ś 18 When Collins first began working at the Training Center in November 2000, coworkers noticed that she tried to fit in with the boys' club atmosphere by engaging in sexual banter with James and exchanging inappropriate emails with him.[4] But after *1219 several months, Collins' attempt to fit in did not seem to work. In October 2002, coworkers noticed that Collins "was really being excluded" from senior staff meetings, which she previously attended as part of the Training Center's "upper management." 17 RP at 2484-86.
ś 19 Around this time, James began calling Collins "a bitch to [her] face" and making demeaning comments about her to other Training Center employees. 13 RP at 1906. James's conduct caused Collins to suffer from panic and anxiety attacks, depression, insomnia, and recurring nightmares about James. Friends and family noticed these uncharacteristic changes in her behavior and observed that she was becoming increasingly depressed and anxious.
ś 20 Worried about Collins' worsening health condition, her husband arrived unannounced at the Training Center on October 31 and took her to see her physician, Dr. Cyril Dodge. Collins told Dr. Dodge about "everything that was going on" at the Training Center and how it caused her to suffer from stress, anxiety, and depression, 13 RP at 1881-82. Based on Dr. Dodge's advice, Collins left town for several days to relax. She did not return to the Training Center after this trip. Instead, on November 6 she met again with Dr. Dodge for counseling related to her serious depression and paranoia.
ś 21 Based on Collins' mental health condition, Dr. Dodge told her that "she absolutely couldn't go back" to the Training Center. Record of Proceedings, Attach. 2, (Dodge Videotaped Dep. (Ex. 308), Sept. 14, 2006 (played at trial on May 10, 2007))[5] (RP (Dodge Dep.)) at 51:3-4. Dr. Dodge also advised Collins to see a specialist, so she began meeting with a psychotherapist, Dr. Laura Caldwell. Like Dr. Dodge, Dr. Caldwell did not think Collins should return to the Training Center because, given her mental health problems, "it would have been very, very detrimental for her to return to that [environment]." 14 RP at 2013.
ś 22 Collins used her accrued sick leave and vacation time until it ran out in March 2004. She did not inform the Training Center of her decision to quit; instead, she remained on her benefit plan until June 4 when the City terminated her employment for not returning to work.
ś 23 In an effort to earn an income, Collins considered starting her own "safety and compliance type business." 13 RP at 1894. She obtained a business license but failed to pursue the idea because she "couldn't concentrate." 13 RP at 1894. Her husband also cautioned her against pursuing her own business, worrying that the effort could negatively impact her health. Although Collins continued to suffer from depression, she obtained part-time work as an administrative assistant between April and September of 2005. At the time of trial, she had worked as an executive assistant for a manufacturing company since October 2005.

3. James's sexually harassing and discriminatory treatment of Hayden and Mason
ś 24 James's inappropriate conduct similarly caused Hayden and Mason to end their employment at the Training Center. After working there for approximately two years, and experiencing James's sexually discriminating conduct and repeated remarks about the size of her breasts, Mason quit.
ś 25 Hayden worked for the Fire District for approximately three and one half years. In November 2003, she, too, left the Training Center because James's sexual harassment and derogatory remarks created "a very toxic, hostile work environment that was very discriminatory against females," 9 RP at 1326, causing her "to suffer serious emotional or psychological harm." 9 RP at 1328.

*1220 4. Lawsuits
ś 26 On February 18, 2005, Larwick, Collins, Hayden, and Mason filed a complaint in Clark County Superior Court, naming as defendants the Fire District, James, Clark County, and the City of Vancouver. They alleged that these defendants had (1) violated the Washington Law Against Discrimination (WLAD) under chapter 49.60 RCW; (2) committed torts of outrage, negligent supervision, and negligent retention; and (3) negligently inflicted emotional distress. Plaintiffs also requested a jury trial, relief for past and future economic and non-economic damages, reasonable attorney fees, and any further relief that the trial court "deem[ed] just, equitable and appropriate." CP at 6.
ś 27 The Fire District and James filed separate answers, each denying the allegations contained in the complaint and asserting affirmative defenses. In addition, the County and the City each filed a separate motion for summary judgment dismissal of Plaintiffs' claims asserted in the lawsuit. The City's motion did not include Collins because she worked as a City employee at the Training Center.
ś 28 The trial court granted the County's motion for summary judgment, dismissing with prejudice Plaintiffs' claims against the County and dismissing the County as a party to the action. It also granted the City's summary judgment motion, dismissing with prejudice Larwick, Hayden, and Mason's claims against the City and ruled that "[e]ach party shall bear its own costs." CP at 1017-18.

II. Jury Trial
ś 29 In May 2007, Plaintiffs began a four-week trial on their remaining claims against the Fire District and James and Collins' claims against the City.[6] The jury heard testimony from more than 50 witnesses, including all four plaintiffs and James.

A. Testimonies of Larwick and Other Witnesses
ś 30 During Larwick's trial testimony, she described James's conduct toward her as "very degrading" and "very distracting." 7 RP at 971. She testified, "It's difficult to do work. It makes you feel completely powerless. You feel like someone [is] coming in, ripping the rug out from under you. You get back up on your feet, and here comes another slam at you. And it was daily." 7 RP at 971. Larwick described James's behavior and explained that his calling her a "stupid woman" and a "stupid bitch" felt like "constant daily battery." 7 RP at 973. She said James's sexually harassing comments about females made her feel embarrassed and uncomfortable. She testified that she "was very discriminated against the entire time [at the Training Center] and when [she] was let go." 8 RP at 1054. She also testified that after she reported James's conduct to Torrens, "I was pretty much pushed off to the side, as Marty did. It was the same behavior; it was the same attitude; it was the same dismissal. I did not matter." 8 RP at 1001.
ś 31 Larwick testified that she had recurrent nightmares about James stating, "I had no idea that this kind of language, this kind of treatment ... could be so draining, so stressful, and cause so much anxiety in my life." 8 RP at 988-89. She explained that working with James caused her to suffer from insomnia, frequent headaches, and "severe neck pain." 8 RP at 989. Larwick's new husband and son similarly testified that the Training Center's "hostile environment" caused her to withdraw from friends and colleagues and to suffer from uncharacteristic depression, isolation, and neck pain related to stress. 8 RP at 1139.
ś 32 In addition, Aileen Bono, one of Larwick's friends and former colleagues, testified that between mid 2000 and October 2002, *1221 Larwick became sad and distressed about James's conduct toward her, including his remark about seeing her panties under her slacks. Kellogg testified about Larwick's interactions with James at the Training Center, noting that Larwick "was very upset because she felt that the way Marty James talked at the office, and sometimes outside of the office about people in the office was very hurtful and damaging and reached the level of sexual harassment." 4 RP at 496-97.

B. Testimonies of Collins and Her Husband
ś 33 Collins testified that when she started working with James, she sometimes joined his "jovial banter," 12 RP at 1734, to fit in and to stay on good terms with him. But she testified that James later began to exclude her from upper management meetings and conversations in which she had previously participated. Collins also testified that James deliberately caused friction between her and Larwick by telling her (Collins) that Larwick was saying derogatory things about her. She testified that James also said demeaning and derogatory things to her about Larwick, often referring to Larwick as "a fucking cunt" and "a lying bitch." 12 RP at 1730-31. According to Collins, James nicknamed Larwick "no panties," 12 RP at 1734-35, commented on her (Larwick's) breasts, 13 RP at 1923, and said, "That bitch has cut my sac," after finding out about Larwick's meeting with Bivins. 12 RP at 1737. Collins testified that after James had hired Ramirez, he (James) told her "that he could finally get rid of the bitch," in reference to Larwick. 12 RP at 1739.
ś 34 Collins and her husband testified that James's conduct at the Training Center caused Collins to suffer "serious emotional and psychological harm," beginning in 2001 and continuing until her termination. 13 RP at 1979. Collins' husband testified that beginning in late 2002, he noticed that "[Collins] was not herself" and was suffering from frequent nightmares and insomnia. 17 RP at 2414. He also testified that during Collins' last few weeks at the Training Center, she "was as bad as [he] had ever seen her," 17 RP at 2417, prompting him to make an appointment with her doctor. Even after Collins had left the Training Center, her husband cautioned her against starting her own business because of his concerns about her health.

C. Testimonies of Hayden and Mason
ś 35 Hayden testified about James's treatment of female subordinates at the Training Center, noting that he often made sexual innuendos, "play[ed] female support staff one against the other," and told Training Center employees "a lot of inaccurate or very demeaning things" about female employees. 8 RP at 1164. Hayden described the Training Center's work environment as "hostile," "toxic," and "very discriminatory against females." 9 RP at 1326. She testified that James made "a lot of lewd remarks" both "to and in front of female staff." 8 RP at 1164. Hayden also testified that her experience at the Training Center caused her to suffer serious emotional and psychological harm.
ś 36 Hayden testified that James's conduct toward Larwick was particularly "disparaging." 9 RP at 1189. She testified that he often told her and other Training Center personnel "derogatory" and demeaning things about Larwick. 8 RP at 1168. Hayden also noted that James's treatment of Larwick "got worse and worse" after Larwick met with Torrens. 9 RP at 1189. Hayden testified, "[I]t was a really, really difficult time for me to see this happening to [Larwick]. And I thought it was just very unjustified." 9 RP at 1189.
ś 37 Mason testified that when she first arrived at the Training Center, she noticed that Larwick "was being verbally attacked in many ways" by James's offensive conduct and that James said "he was going to get rid of her." 17 RP at 2481. Mason testified that she "couldn't understand why [James] was so cruel to [Larwick]," 17 RP at 2464, and noted that she (Mason) "was afraid to get close to [Larwick] because she was such a target" for James. 17 RP at 2466. For *1222 example, Mason heard James call Larwick a "stupid cunt" and a "stupid woman" on multiple occasions. 17 RP at 2465. James also inappropriately commented on Larwick's dating relationship with an African-American man, telling Mason and Collins on one occasion, "I can just see that little black monkey crawling all over her, F'ing her with his big dick." 17 RP at 2464. And after James repeatedly leered at Mason's breasts and commented about them in the presence of other employees, she purposely wore loose-fitting shirts and thick bras to make them less noticeable.

D. Testimonies of James and Torrens
ś 38 James testified that none of the four Plaintiffs had told him that his remarks were inappropriate. He did, however, admit to having made sexually inappropriate and discriminatory comments while supervising the Training Center employees. For example, James admitted that he (1) commented on the anatomy of female passersby; (2) referred to female subordinates, including Collins and Larwick, as "bitchy" or "bitch," 2 RP at 243; (3) asked female employees, "Happy to see me, or is it cold in here?" in reference to "ladies' nipples getting hard," 2 RP at 239-40; (4) told Hayden, "I had the best dream about you last night, me and you, and it was so good," 2 RP at 240; (5) said, "I bet she's on the rag," in reference to a female employee's "attitude," 2 RP at 248; and (6) often discussed breasts with Collins, which "seemed to be one of the hot topics" in their banter. 2 RP at 269. In addition, James admitted that he referred to a female subordinate as a typical woman who would just start crying if she were criticized, but he qualified this response by adding that he said this in reference to a particular employee who had a tendency to cry easily.
ś 39 On the subject of Larwick's termination, James testified that when the Fire District decided to hire a full time program director, the budget no longer allowed for Larwick's position. Fire District Commissioner Torrens testified that (1) James, as chief administrator, had the most influence over the Training Center's day-to-day operations; and (2) because James reported directly to the commissioners, he also had the most influence over the information they received about the Training Center and its personnel. Torrens testified that the Fire District terminated Larwick because (1) the Training Center needed "somebody with a degree" to obtain accreditation from Clark College for the paramedic program, 16 RP at 2378; and (2) the Training Center was "struggling to stay afloat" financially and could not afford to pay salaries to both Larwick and Ramirez. 16 RP at 2378. When asked why he told James about Larwick's complaint instead of discussing the issue at one of the Board of Commissioners' meetings, Torrens replied, "I assumed based on the trust that I continued to have with Marty James, that the problem would be dealt with. I had no reason to believe otherwise." 16 RP at 2332.

E. Testimonies of Lierman and Ross
ś 40 Walter Lierman, Plaintiffs' forensic economist, prepared spreadsheets for each plaintiff's projected future lost earnings and pension benefits. Lierman based his calculations on City and Fire District personnel records and income statements, and he adjusted the calculations for each individual's gross earnings to factor in fringe benefits and the probability of unemployment or voluntary leave from the workforce. On cross-examination, Lierman explained that because there is no guarantee that Plaintiffs would have continued working at the Training Center until retirement, he used these adjustments to account for the unforeseen eventualities that could impact a person's ability to stay and to work in a position.

1. Collins' wage and pension losses
ś 41 To calculate Collins' past wage loss, Lierman subtracted what she would have been earning if she were still at the Fire District "less any kind of job she may have found in the competitive labor force." 19 RP at 2731. Lierman based his calculation on *1223 the period of time between Collins' loss of employment in 2004 and the then-present date (midpoint of 2007). He noted that her return to full-time employment in 2006-2007 substantially reduced the losses resulting from her termination. Lierman further testified that because he had received no information about whether Collins had earned any income in 2005, he noted her 2005 earnings as "[$]0" in his lost-earnings calculation. Ex. 318.
ś 42 For Collins' future wage loss, Lierman considered three time periods: three, five, and 10 years from the midpoint 2007. He then calculated the present value of the wage loss for each time period, assuming an interest rate of 5.75 percent, based on the rate of return for low-risk municipal bonds. Lierman calculated Collins' future economic wage loss at $100,377 for three years, $151,712 for five years, and $263,788 for 10 years.
ś 43 Turning to Collins' pension benefit losses, Lierman reviewed the Fire District's rate of contribution into Collins' pension plan and calculated her past pension loss at $6,000. To calculate her future pension loss, Lierman used the "more conservative approach" of applying the Public Employees Retirement System's retirement age of 65 years instead of the Social Security Administration's raised retirement age of 67 years. 19 RP at 2736. Lierman calculated Collins' future pension loss at $286,022 (from the midpoint of 2007 to her projected date of retirement in 2043). Lierman calculated the present value of her total loss at $519,954 for three years, $571,289 for five years, and $683,365 for 10 years.

2. Larwick's wage and pension losses
ś 44 Using the same approach, Lierman next calculated Larwick's past and future wage and pension benefit losses. Lierman calculated Larwick's past wage loss at $206,817 (from her termination in 2002 to the midpoint of 2007). He calculated her future wage loss at $173,385 for three years, $265,150 for five years, and $474,480 for 10 years.
ś 45 Next, Lierman calculated Larwick's past pension benefit loss at $5,352. He calculated her future pension benefit loss at $243,122 (from the midpoint of 2007 to her projected date of retirement in 2040). Combining Larwick's total wage and pension loss, Lierman calculated the present value of her total loss at $628,676 for three years, $720,441 for five years and $929,771 for 10 years.
ś 46 On the spreadsheet that Lierman had prepared to reflect Larwick's total losses, he noted that she was self-employed as an artist but included no income for this occupation "since the business is in the developmental stage." Ex. 320. Lierman had also prepared a separate spreadsheet for Larwick to reflect her total losses if she were to reenter the competitive labor market in a secretarial position. In that scenario, Lierman calculated the present value of Larwick's total loss (wage loss and pension benefit loss) at $521,388 for three years, $554,731 for five years, and $626,377 for 10 years.
ś 47 In calculating the foregoing sums, Lierman testified that he did not make any qualitative decisions about the type of job for which any of the four Plaintiffs might be qualified for employment; and he did not meet with Collins, Larwick, Mason and Hayden or otherwise obtain personal information from them. When asked why he provided three different time frames, Lierman replied, "Those were choices that were ... arbitrarily chosen to provide a range of losses to provide for the jury a range to assess at the present time." 19 RP at 2759. He added that he had calculated a range of time frames to provide the jurors with worksheets to use during their deliberations to calculate the amounts themselves based on what they felt was appropriate. Defendants did not object when the trial court admitted Lierman's spreadsheets into evidence.
ś 48 Richard Ross, a financial consultant and vocational specialist, estimated Plaintiffs' future wage losses. Ross testified that Collins had earned approximately $10,400 in 2005. He noted that she was earning $54,000 *1224 annually at her current job (at the time of trial). In addition, Ross testified that Larwick "has withdrawn from the competitive labor force, lives up in the mountains, and is attempting to assist her husband with his enterprise, Larwick Timberlands." 18 RP at 2518.

F. Testimonies of Dodge, Caldwell, and Boehnlein
ś 49 The trial court played for the jury a video recording of Dodge's deposition, in which he testified that on October 31, 2003, he began treating Collins for depression and anxiety related to her "interactions" with James. RP (Dodge Dep.) at 24:11. When asked whether he believed "Collins' symptoms of depression and anxiety were caused by sexual harassment in the workplace," RP (Dodge Dep.) at 39:8-11, Dodge responded, "[Collins] felt that those were the problems. And so I took it at face value and treated her for that." RP (Dodge Dep.) at 39:15-17. Dodge also testified that because Collins "knows half of the county," RP (Dodge Dep.) at 55:9, it was difficult for her to find work that did not "remind her of the injuries." RP (Dodge Dep.) at 55:4-5. Dodge noted that on March 29, 2004, Collins suffered an "emotional setback when she had to go through the chronology of events leading up to her legal action." RP (Dodge Dep.) at 49:5-7. Dodge also noted that Collins "absolutely couldn't go back to the fire department," RP (Dodge Dep.) at 45; 16-17, "she was still struggling emotionally," RP (Dodge Dep.) at 51, 4-5 and "[her] medical illness is currently totally disabling and will remain so for the foreseeable future." RP (Dodge Dep.) at 57:14-16.
ś 50 Caldwell, Collins' psychotherapist since February 2004, testified at trial that when she first met with Collins, Collins (1) showed signs of "moderate to severe" depression and anxiety; (2) appeared "sad," "tearful," and "unraveled"; (3) isolated herself from others; (4) suffered from insomnia; and (5) "struck [Caldwell] as someone who had been kind of broken down over a period of time." 14 RP at 1997-98. On cross-examination, counsel asked Caldwell about a handwritten line from her session notes on Collins, which read, "[s]he was depressed after lawyer put kibosh on her starting business," and, "bad for court case." 14 RP at 2006. Caldwell testified that because this handwritten line contained no quotation marks, "it's very possible it would be myâ my words, my interpretation," rather than something that Collins had articulated during a therapy session with her. 14 RP at 2006.
ś 51 Dr. James Boehnlein, a forensic psychiatrist, testified that he met individually with each of the four Plaintiffs twice before trial to discuss health conditions. He testified that the long-term effects of the Training Center's environment on Collins' mental condition included periods of "feeling trapped, of being closed in, of fear, [and] of humiliation." 19 RP at 2804. Boehnlein testified that Larwick's psychiatric symptoms included recurrent nightmares about James yelling at her and that after Larwick's termination, she dealt with the stress of working with James by "isolat[ing] herself from other people". 19 RP at 2825.

G. Closing Argument
ś 52 During closing argument, Plaintiffs requested $1 million each in non-economic damages, asserting these amounts would appropriately compensate them for the pain and suffering that they experienced in the past and will experience into the future as a result of James's sexual harassment and gender discrimination. Plaintiffs' trial counsel, Thomas Boothe, argued in closing:
But I'll leave you with the request that we are going to make for an award of $1 million in non-economic damages for each of the four claimants.
The amount that's being sought will not in any way reduce fire services, hurt the department. It's not going to do anything that will hurt services in any way, or raise taxes, do any of the bogeys that might be mentioned. It will not happen. We know that.

What you need to do, please, is put a value on their suffering that other departments *1225 will look up and say, "We can't do that." Put a value on what they have experienced and compensate them to a level that says, "If you do this, serious consequences flow, and we compensate people as they are injured." And in so doing, help let the commissioners know the answer to the question they felt had to go to you all to be decided. And in so doing, also let HR departments know that there's a better structure, there's a better way to do this.

HR departments don't exist for the protection of the City. HR departments don't exist for the protection of the company. Let them know that they have to be up there with a viable means for somebody who's experiencing harassment to step forward and bring it forth in a safe way. And an award of $1 million [to each of the four women] ... is the best way you can do that.
30 RP at 4246-47 (emphasis added). Defendants did not object to this or any other portion of argument.

H. Jury's Deliberation and Verdict
ś 53 During its deliberations, the jury asked for an electronic calculator to use in their deliberations, which the trial court provided. On June 1, the jury returned a verdict in favor of the Plaintiffs. For all four Plaintiffs, the jury found that (1) the Fire District and James "create[d] a hostile work environment," (2) the Fire District did not "exercise reasonable care to prevent and correct promptly the sexually harassing behavior," and (3) the Plaintiffs did not "unreasonably fail to take advantage of any preventative or corrective opportunities provided by the Fire District or to avoid harm otherwise." CP at 248-52.
ś 54 For Larwick, the jury found that her gender and opposition to sex-based discrimination were a "substantial factor in the Fire District's decision to terminate her." CP at 250. The jury awarded Larwick $626,000 in economic damages for past and future lost wages and lost pension benefits and $875,000 in non-economic damages for emotional distress.
ś 55 For Collins, the jury found that the City was negligent in placing her under James's supervision. The jury also found that Collins was "contributorily negligent in her actions," CP at 248, and attributed 50 percent of the negligence to her, thereby entitling her to half of the $540,000 award for economic damages and half of the $75,000 award for non-economic damages.[7] In addition, the jury awarded Mason $215,000 in economic damages and $250,000 in non-economic damages; it awarded Hayden $350,000 in economic damages and $600,000 in non-economic damages.

III. Post-Trial Motions

A. Defendants' Motion for New Trial or Remittitur
ś 56 Defendants moved post-verdict for a new trial or remittitur under CR 59(a), judgment as a matter of law under CR 50(b), and a new trial or remittitur under RCW 4.76.030. They argued that (1) "irregularity or misconduct based on improper inference of insurance" entitled them to a new trial because Plaintiffs' counsel "strongly implied in closing arguments that the [d]efendants had liability insurance to cover any adverse judgment,"[8] CP at 277; (2) the jury's "excessive" damages award resulted from "passion or prejudice" and was an attempt "to impose punitive damages,"[9] CP at 284; and (3) the jury's "excessive" damages award required a new trial or remittitur because "substantial *1226 justice has not been done,"[10] and substantial evidence failed to support Plaintiffs' awards for economic damages.[11] CP at 292-93.
ś 57 In Plaintiffs' memorandum in opposition to Defendants' motions, they asserted that (1) their trial counsel did not improperly invoke insurance during closing argument; (2) "the amounts of damages awarded [we]re rational," CP at 346; (3) expert testimony supported the jury's damages awards; (4) Defendants were not entitled to remittitur because the jury's determination of damages "was well based," CP at 360; (5) during the four-week trial, the jury took "copious" notes and evaluated testimony from more than 50 different witnesses, CP at 360; (6) the jury brought Lierman's financial spreadsheets and a calculator into the jury room to assess Plaintiffs' individual damages awards; and (7) Defendants' cited authorities failed to support their arguments.
ś 58 The trial court denied Defendants' post-trial motions for a new trial or remittitur, except their motion to remit excessive damages, which it granted in part by reducing Larwick's economic and non-economic damages awards. The trial court did not similarly alter the jury's damages awards for Collins, Hayden, or Mason.
ś 59 The trial court ruled that Boothe's closing argument comment about fire services was "one very small portion [of Plaintiffs' closing argument]," permissible under the circumstances since "the Fire District encompasses a large taxing area," and "indirect" because "[it] was not addressed in such a manner as to incite the jury on beyond reasonable awards," nor was it an "attempt to set forth monetary issues other than that which would directly compensate [Plaintiffs] for the damages they suffered."[12] CP at 888-89. For these reasons, the trial court denied Defendants' motion, noting that "[t]aken together without objection, [Boothe's closing argument comment] is not so prejudicial to warrant the granting of a new trial." CP at 889.
ś 60 In denying Defendants' motions for a new trial or remittitur based on their contention that the jury's damages awards to Plaintiffs were excessive, the trial court reviewed the jury's award for each of the four Plaintiffs. Noting that Plaintiffs requested a "high" damages award, the trial court analyzed whether substantial evidence supported these awards or whether they were "so excessive... as to unmistakably ... have been the result of passion or prejudice." CP at 891 (quoting RCW 4.76.030).

1. Larwick
ś 61 The trial court granted, in part, Defendants' motion for remittitur with respect the jury's verdict for Larwick. The trial court reduced Larwick's economic damages award from $626,000 to $150,000[13] and her non-economic damages award from $875,000 to $250,000.

2. Collins
ś 62 The trial court refused to disturb the jury's verdict for Collinsâ $270,000 in economic damages and $37,500 in non-economic damages (these totals reflect the jury's 50 percent reduction of Collins' amounts for her percentage of contributory negligence). The trial court reasoned that although Collins' behavior at the Training Center "was totally inappropriate," James had not only permitted it to occur, "but he helped promote some of the specific activities in question," despite having a "clear duty and responsibility as director of the [T]raining [C]enter to prevent *1227 any such actions from taking place." CP at 894.

3. Mason and Hayden
ś 63 The trial court also refused to disturb the jury's verdicts for Mason and Hayden. The trial court determined that Mason's awards of $215,000 for economic damages and $250,000 for non-economic damages fell "within the range of the testimony that the jury heard." CP at 895. Noting that Hayden's testimony "clearly established she was adversely affected and unable to deal with the [work] environment," which resulted in a "material change [in] her economic well-being," CP at 892, the trial court determined that substantial evidence supported Hayden's awards of $350,000 for economic damages and $600,000 for non-economic damages.[14]

B. Petition for Attorney Fees and Costs
ś 64 Plaintiffs also filed a petition requesting "reasonable attorney fees" and costs under RCW 49.60.030(2), including: (1) $603,906 for the work that Boothe, their primary counsel, performedâ 2037.8 hours at an hourly rate of $300; (2) $3,124 for the work that Boothe's contract attorney contributed to the caseâ 26.2 hours at an hourly rate of $120; and (3) $77,636 for the work attributed to Boothe's legal assistantsâ 970.55 hours at an hourly rate of $80. CP at 390. In support of their request for attorney fees, Plaintiffs attached to the petition 225 pages of billable-hour records and invoices. They also attached several written declarations, including sworn statements from Boothe's legal staff asserting that the billing records for Plaintiffs are "detailed and accurate." CP at 810.
ś 65 In addition, Plaintiffs submitted several declarations from attorneys to support their request that the trial court set the lodestar at a $300-hourly rate. David B. Markowitz, a civil litigation attorney, filed a declaration noting that (1) $330 is the average billing rate in the Portland area for an attorney with Boothe's level of experience; and (2) considering Boothe's skill and reputation and the contingent risk in this type of case, a $300 hourly rate is reasonable. Gregory D. Ferguson, an attorney who had observed part of the trial proceedings, filed an affidavit supporting Plaintiffs' attorney fee request, noting that (1) Boothe "was well prepared" for questioning more than 50 witnesses, CP at 739; (2) Boothe's normal fee of $300-$350/hour was reasonable "in light of his skills and [25] years of experience," CP at 740; and (3) a lodestar multiplier is appropriate given the "significant cost of litigation," the "very real chance of no recovery," and the "disparity in litigation `muscle' as between the defense and [P]laintiffs' counsel." CP at 740.
ś 66 In addition, Mary Ruth Mann, an employment discrimination consultant and attorney, filed a declaration supporting Plaintiffs' request for attorney fees. Her declaration noted that (1) "[Boothe's] legal work and trial work appear excellent and on par with attorneys charging rates of $350 or higher," CP at 747; (2) his billing records "are detailed and contemporaneous," CP at 749; (3) "there appears to be no overlap of trial preparation work," CP at 749; and (4) the "[t]he amount of fees is efficient and reasonable given four plaintiffs and three defendants." CP at 749.
ś 67 Defendants filed separate memoranda opposing Plaintiffs' requested awards. Defendants argued that (1) an hourly rate of $225 reflects Clark County's prevailing market rate for attorney fees; (2) Plaintiffs are not entitled to attorney fees for the "time spent pursuing unsuccessful claims against other defendants," namely the the City, CP at 847; (3) Boothe's decision to take the case *1228 on a contingent fee basis does not warrant an increase in the trial court's determination of a reasonable hourly rate because it awarded attorney fees to Plaintiffs at the top end of the prevailing market rate; (4) Boothe's billing records are defective "because everything is billed as a block rather than as individual tasks" and "no one can determine how much time was expended on anything," CP at 846; and (5) Plaintiffs are not entitled to attorney fees for the time that Boothe's legal assistants spent on their case. Defendants also submitted declarations from several local attorneys estimating the reasonable hourly rate for Boothe's attorney fees at between $210 and $225.
ś 68 The trial court awarded attorney fees and costs to Plaintiffs based on 225 pages of Boothe's billing records, which reflected more than 2,000 hours of legal work that Boothe and his assistants[15] had spent on Plaintiffs' case. Before calculating the attorney fees, however, the trial court deducted $32,000 from the $37,000 amount that Plaintiffs claimed to have incurred for the services of a voir dire consultant because they had failed to provide any itemized billing.

1. Hourly rate
ś 69 In setting the lodestar at a $280-hourly rate for Boothe's services the trial court noted that, although Plaintiffs' declarations supported their request for an hourly rate exceeding $300, a rate of $280 "appears to be within the range of reasonable fees." CP at 897. The trial court also noted that the average hourly rate for attorney fees in Clark County does not necessarily reflect the reasonable rate of fees in Plaintiffs' case, stating, "To argue that Clark County standards would set the fee is not persuasive as counsel in this highly specialized field often would be from Seattle or Portland where they're with firms more highly specialized in this type of case and management." CP at 897 (emphasis added).

2. Contingency multiplier
ś 70 The trial court noted that plaintiffs who seek claims for damages under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, generally face a "well-financed defendant" and that cases of this type "are difficult to try and represent a substantial risk." CP at 896. The trial court found that (1) Boothe had "funded [Plaintiffs'] case in total as none of the plaintiffs had the ability to assist, and his records would reveal that approximately $160,000 of his own funds were used in financing the case"; and (2) Boothe had faced a "high contingency" in taking this case because Plaintiffs could not afford to reimburse his costs if the jury ruled against them. CP at 897.
ś 71 In spite of the high contingency nature and the highly specialized skills involved in this type of employment case, the trial court declined to apply an additional contingency risk multiplier. Instead, the trial court determined, without further explanation, that the $280-lodestar rate adequately accounted for the contingency risk factor, stating, "[B]ecause of this high contingency, a lodestar figure has been accepted as an appropriate way to insure[sic] that these parties will be appropriately represented by counsel and have the ability to bring their claim to an ultimate resolution before a jury." CP at 897.

3. Unsuccessful claims
ś 72 The trial court subtracted $21,068 in attorney fees for the number of hours expended pursuing Plaintiffs' unsuccessful claims against the City. In addition, the trial court subtracted 70 hours from its attorney fee calculation because the County's and the City's successful motions for summary judgment had consumed approximately 70 hours of the total time that Boothe had spent on Plaintiffs' case. After deducting $74,068 from Plaintiffs' requested amount, the trial court awarded $752,854 to Plaintiffs in attorney fees and costs.

IV. Appeal and Cross Appeal
ś 73 Defendants appeal the trial court's denial of their post-trial motions for a new *1229 trial under CR 59(a) and partial denial of their post-trial motions for remittitur under RCW 4.76.030. Larwick appeals the trial court's remittitur reduction of her jury awards for economic and non-economic damages, and Collins and Larwick appeal the trial court's award of attorney fees and costs for all four Plaintiffs. Larwick also cross-appeals the trial court's reduction of her non-economic damages.

ANALYSIS

I. Defendants' Motions for New Trial or Remittitur Evidence
ś 74 Defendants argue that the trial court abused its discretion in denying their motions for a new trial or remittitur under CR 59(a) and RCW 4.76.030 because the evidence failed to support the jury's damages awards for Collins and Larwick. We disagree.

A. Standard of Review
ś 75 We review for abuse of discretion a trial court's denial of a CR 59(a) motion for a new trial. Sommer v. Dep't of Soc. & Health Servs., 104 Wash.App. 160, 170-71, 15 P.3d 664, review denied, 144 Wash.2d 1007, 29 P.3d 719 (2001). The test for determining such an abuse of discretion is whether "such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent [the] litigant from having a fair trial." Aluminum Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wash.2d 517, 537, 998 P.2d 856 (2000) (quoting Moore v. Smith, 89 Wash.2d 932, 942, 578 P.2d 26 (1978)). We review a trial court's denial of a new trial more critically than we do its grant of a new trial because a new trial places the parties where they were before, while a decision denying a new trial concludes their rights. State v. Taylor, 60 Wash.2d 32, 41-42, 371 P.2d 617 (1962). Denial of a motion for remittitur also strengthens the verdict. Bunch v. King County Dep't of Youth Servs., 155 Wash.2d 165, 180, 116 P.3d 381 (2005) (citing Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 330, 858 P.2d 1054 (1993)).
ś 76 When reviewing a trial court's ruling on a motion for remittitur, "we strongly presume the jury's verdict is correct," Bunch, 155 Wash.2d at 179, 116 P.3d 381 (quoting Sofie v. Fibreboard Corp., 112 Wash.2d 636, 654, 771 P.2d 711, 780 P.2d 260 (1989)); thus, we will not disturb a jury's damages award "unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice" after viewing the evidence in the light most favorable to the non-moving party.[16]Bunch, 155 Wash.2d at 179, 116 P.3d 381 (quoting Bingaman v. Grays Harbor Cmty. Hosp., 103 Wash.2d 831, 835, 699 P.2d 1230 (1985)). When the proponent of a new trial argues that the verdict was not based on the evidence, [we] review[ ] the record to determine whether there was sufficient evidence[17] to support the verdict. Sommer, 104 Wash.App. at 172, 15 P.3d 664. We review a trial court's denial of remittitur for an abuse of discretion. Bunch, 155 Wash.2d at 176, 116 P.3d 381.

B. Collins' Economic Damages Award

1. Loss calculations
ś 77 Defendants argue that substantial evidence failed to support the jury's award for Collins' economic damages because Lierman failed to include Collins' 2005 earnings in his calculation of her total wage and *1230 benefit loss.[18] Defendants note that although Lierman calculated Collins' 2005 earnings at "[$]0," Ex 318, Plaintiffs' financial consultant, Richard Ross, testified that Collins had earned approximately $10,400 during a 26-week interval in 2005.
ś 78 Although Lierman did not include Collins' 26-week earnings in his calculation, he specifically encouraged the jury to use the spreadsheets as guide during their deliberations to calculate the figures themselves and to determine an amount that they felt was appropriate. In contrast, Ross's testimony specifically informed the jury that Collins earned approximately $10,400 in 2005. The jury had ample opportunity to assess Ross's evidence against Lierman's spreadsheet calculations in determining Collins' economic damages award.
ś 79 Nor does the evidence support Defendants' characterization of Collins' and Larwick's damages awards as "excessive." Br. of App/Cross Resp. at 9. Lierman recommended compensating Collins $638,365 for future lost earnings during a 10-year time frame, but the jury awarded her $540,000 and then cut that amount in half to $270,000 based on Collins' contributory negligence. Because the jury ultimately awarded Collins less than half of the amount that Lierman had recommended, Defendants fail to show that Lierman's calculations directed the jury's verdict or otherwise caused the jury to award excessive economic damages to Collins.

2. Substantial evidence
ś 80 Similarly failing is Defendants' argument that substantial evidence does not support Collins' jury award for economic damages because Lierman's spreadsheets "were not particularized to each plaintiff's situation." Br. of App/Cross Resp. at 13. On the contrary, Lierman prepared the spreadsheets for each Plaintiff individually, and his spreadsheets contained data reflecting each Plaintiff's personal record of earnings and pension benefits.
ś 81 Lierman also calculated the projected future loss for each Plaintiff measured during three, five, and ten-year periods of time. Lierman testified that he used these three periods "to provide for the jury a range [of losses] to assess at the present time." 19 RP at 2759. He did not suggest that the spreadsheets or their information represented an accurate and/or complete picture of Plaintiffs' loss; rather, he described the spreadsheets as mere guidelines for the jury to use during its deliberations to determine the appropriate amounts themselves. Not only did Defendants fail to object to admitting these spreadsheets into evidence at trial, but also the record does not support their argument on appeal.

3. Mitigation
ś 82 Defendants further argue that substantial evidence fails to support the jury's damages award to Collins because she failed to mitigate her damages when she "abandon[ed]" her job and "relied on her vacation and sick pay until it ran out in March 2004."[19] Br. of App/Cross Resp. at 11. On the contrary, the record shows that Collins sought employment until her mental health problems interfered.[20] She testified that during the first few months after leaving *1231 the Training Center, (1) she looked for work and planned to start a government supply business in 2004; and (2) after obtaining a license for this business, her mental health problems caused her to abandon the venture. Both of Collins' doctors confirmed that she did look for employment following her termination until her mental health problems forced her to suspend the effort. Collins' husband testified that when she discussed starting a business, he cautioned her against it due to concerns about her mental well-being and state of mind at that point. In addition, the record shows that Collins' physician recommended that she take vacation trips to relax and to remove herself from the events at the Training Center.
ś 83 The foregoing facts demonstrate that Collins attempted to mitigate her losses from her job termination. Reviewing these facts under the "strong presumption in favor of the jury's verdict" we hold that the trial court did not abuse its discretion in denying Defendants' request for a new trial and partially denying its request for remittitur to reassess Collins' economic damages award. See Bunch, 155 Wash.2d at 176, 179, 116 P.3d 381.

C. Larwick's Economic Damages Award, Reduced on Remittitur
ś 84 Defendants next argue that substantial evidence fails to support Larwick's jury award for economic damages because Lierman's calculations neither included income for her occupation as an artist nor considered her voluntary withdrawal from the labor market. This argument also fails.
ś 85 Defendants' argument fails to acknowledge that the trial court had already reduced Larwick's damages award by a significant sum on remittitur. Their argument also fails to discuss that Lierman prepared a separate spreadsheet for Larwick, which reflected her total losses if she were to reenter the competitive labor market in a secretarial position. In that scenario, Lierman calculated the present value of Larwick's total wage loss and pension benefit loss at $626,377 for a 10-year period; and the record shows that the jury followed this modified calculation because it awarded Larwick exactly a $626,000 award on remittitur. Accordingly, we hold that Defendants failed to demonstrate that the trial court abused its discretion in denying their motions for a new trial and in only partially granting their motions for remittitur[21] on Larwick's economic damages award.

D. Larwick's Non-Economic Damages Award, Reduced on Remittitur
ś 86 Defendants similarly contend that the jury's award for Larwick's non-economic damages "w[as] largely unsupported" by the evidence because she failed to show that she had suffered from any mental or emotional injury as a result of James's comments. Br. of App/Cross Resp. at 14-15. Again, Defendants' argument fails to address the extent to which the trial court agreed with their assessment and substantially reduced the jury's non-economic damages award on remittitur from $875,000 to $250,000. On cross appeal, Larwick argues that the trial court erred in reducing her non-economic damages award for reasons "contrary to the evidence." Br. of Resp. at 64. Larwick's argument prevails.
ś 87 Defendants first assert that "instead of taking `deep offense'" to James's conduct, "Larwick merely thought it was `crude,'" and her "feelings of embarrassment and frustration" about this conduct "cannot be signs of `emotional disarray.'" Reply Br. of App/Cross Resp. at 5. Contrary to this argument, substantial evidence supports Larwick's award for non-economic damages: The jury heard testimony from multiple witnesses who confirmed that James's inappropriate conduct caused Larwick to suffer mental and emotional injury. For example, James's conduct caused her to suffer physical, stress-related *1232 symptoms, including disabling neck and back pain, and psychiatric symptoms, which included: serious depression, anxiety, and recurrent nightmares about James's demeaning and sexist treatment of her at the Training Center. Thus, substantial evidence in the record shows that (1) Defendants mischaracterize Larwick's reaction to James's conduct, and (2) their argument ignores the serious mental and emotional injury that James's conduct caused Larwick.
ś 88 Defendants next argue that "much of Larwick's testimony in support of her sexual harassment claim had nothing to do with her injuries." Br. of App/Cross Resp. at 16. Instead, they assert that Larwick's trauma arose from her discovery that her then husband was molesting her daughter. Contrary to Defendants' assertions, however, the record shows that Larwick sought therapy because she was anxious and depressed after enduring James's comments at the Training Center. Kellogg's trial testimony demonstrates that Larwick (1) expressed concerns about James's inappropriate conduct in March 2001; (2) received therapy treatment from Kellogg for stress and mental health issues related to her interactions with James; and (3) sought additional counseling, while she was still in therapy to recover from the effects of James's inappropriate conduct. Larwick sought additional therapy from Kellogg to address her (Larwick's) family problems. Furthermore, Larwick's friends and family members testified that it was the Training Center's "hostile environment," not Larwick's family problems, that caused her to isolate herself from others and to suffer from depression, anxiety, and stress-related neck pain. 8 RP at 1139. Thus, substantial evidence supports Larwick's full award for non-economic damages. We hold, therefore, that the trial court erred in granting, in part, Defendants' post-trial motions for remittitur on Larwick's damages award.

II. Larwick's Damages Reduced on Remittiturâ Cross Appeal
ś 89 In her cross appeal, Larwick argues that the trial court erred in reducing the jury's award for her economic damages (from $626,000 to $150,000) and non-economic damages (from $875,000 to $250,000) on remittitur. We agree.

A. Standard of Review
ś 90 RCW 4.76.030 provides:
If the trial court shall, upon a motion for new trial, find the damages awarded by a jury to be so excessive or inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice, the trial court may order a new trial or may enter an order providing for a new trial unless the party adversely affected shall consent to a reduction or increase of such verdict, and if such party shall file such consent and the opposite party shall thereafter appeal from the judgment entered, the party who shall have filed such consent shall not be bound thereby, but upon such appeal the court of appeals or the supreme court shall, without the necessity of a formal cross-appeal, review de novo the action of the trial court in requiring such reduction or increase, and there shall be a presumption that the amount of damages awarded by the verdict of the jury was correct and such amount shall prevail, unless the court of appeals or the supreme court shall find from the record that the damages awarded in such verdict by the jury were so excessive or so inadequate as unmistakably to indicate that the amount of the verdict must have been the result of passion or prejudice.

(Emphasis added.)
ś 91 Unlike denial of remittitur, which we review for abuse of discretion, we review de novo a trial court's order to remit damages because, in that instance, the trial court has substituted its opinion for that of the jury on a question of fact. Bunch, 155 Wash.2d at 176, 116 P.3d 381; RCW 4.76.030. Again, (1) we view the evidence in the light most favorable to the non-moving party, (2) we strongly presume that the jury's verdict is correct; and (3) we will disturb the jury's *1233 verdict only if it is outside the range of substantial evidence, shocks the conscience, or appears to have resulted from the jury's passion or prejudice. Bunch, 155 Wash.2d at 179, 116 P.3d 381 (citing Bingaman, 103 Wash.2d at 835, 699 P.2d 1230).

B. Reduced Economic Damages
ś 92 Larwick argues that the trial court erred in reducing her economic damages award based on her "Post-Termination Circumstance." She asserts that the trial court "ignored the substantial testimony" about her withdrawal from society, which was caused by James's inappropriate conduct and, therefore, was not voluntary, as the trial court characterized it. Br. of Resp/Cross App. at 65-66. Larwick is correct.
ś 93 In remitting Larwick's economic damages award from $626,000 to $150,000, the trial court reasoned that (1) the jury's determination of Larwick's economic damages award "was influenced by ... [a] feeling of resentment against the District for an action against an employee who ... had been one of the primary persons putting the program in place"; (2) Larwick's subsequent actions indicate that she stabilized her life after a total change of career; (3) Larwick's beginning to assist with her new husband's tree-farming business before the jury's determination of her economic damages; and (4) the jury's failure to take into account Larwick's decision not to return to "the labor market of comparable earnings." CP at 893-94. For these reasons, the trial court allowed two and one half years loss of wages and pension benefits as compensation for Larwick, "which takes into account her testing the new employment with her husband" and her "decision to no longer continue an active employment search." CP at 894.
ś 94 But we review the trial court's reduction of the jury's damages award de novo, looking at the facts in the light most favorable to Larwick and presuming the correctness of the jury's verdict. Bunch, 155 Wash.2d at 179-80, 116 P.3d 381 (citing Sofie, 112 Wash.2d at 654, 771 P.2d 711, 780 P.2d 260). Having applied this standard of review to the record before us, we cannot say that jury's verdict is outside the range of substantial evidence, shocks the conscience, or appears to have resulted from the jury's passion or prejudice. Bunch, 155 Wash.2d at 179, 116 P.3d 381 (citing Bingaman, 103 Wash.2d at 835, 699 P.2d 1230).
ś 95 The record demonstrates that James singled out Larwick as the "target" of his offensive and discriminatory conduct. 17 RP at 2466. Larwick testified at trial about experiencing numerous instances of James's derogatory sexist conduct, including his placing a wind-up penis next to her and laughing as it hopped around her desk. Mason testified at trial that James routinely targeted and "verbally attacked" Larwick. 17 RP at 2481. She testified that she (1) "couldn't understand why [James] was so cruel to [Larwick]," 17 RP at 2464; (2) "was afraid to get close to [Larwick] because she was such a target" for James, 17 RP at 2466; (3) heard James call Larwick a "stupid cunt" and a "stupid woman" on multiple occasions, 17 RP at 2465; and (4) observed that James inappropriately commented on Larwick's dating relationship with an African-American man, telling Mason and Collins on one occasion, "I can just see that little black monkey crawling all over her, F'ing her with his big dick." 17 RP at 2464.
ś 96 Similarly, Hayden testified that James's conduct toward Larwick was particularly "disparaging," 9 RP at 1189, and that he often said "derogatory" things to her about Larwick, such as, "[t]hat God damn Val." 8 RP at 1168. Hayden testified that James's comments about Larwick "got worse and worse" after Larwick spoke to Torrens about James's offensive conduct, which conduct she (Hayden) "thought it was just very unjustified." 9 RP at 1189.
ś 97 Larwick's two to three months of volunteer work plus her 28 months of employment at the Training Center demonstrate that she endured James's sexist and demeaning conduct for a total of 30-31 months before he recommended terminating her from *1234 the organization that she had developed. Based on these facts, substantial evidence supports the jury's award of economic damages to Larwick.

C. Reduced Non-Economic Damages
ś 98 Next, Larwick argues that the trial court erred in reducing her non-economic damages on remittitur because it (1) incorrectly calculated her length of her service at the Training Center; (2) underestimated the "relative severity" of James's direct attacks against her, compared to his conduct toward Collins, Mason and Hayden; and (3) "impermissibly supplanted the jury['s role]" in finding that she had stabilized her life and had withdrawn from "the labor market of comparable earnings."[22] Br. of Resp./Cross App. at 64-66; CP at 894. Again, applying the de novo standard of review, we agree.
ś 99 The record also supports the jury's larger emotional damages award to Larwick based on James's more intensely harassing treatment of, and focus on, her as compared to his treatment of the other women he harassed at the Training Center. For example, Mason and Hayden testified that "Larwick was James[sic] particular target." Br. of Resp/Cross App. at 65. According to Mason, James "was so cruel to [Larwick]" that she (Mason) "was afraid to get close to [Larwick] because [Larwick] was such a target." 17 RP at 2464, 2466. Similarly, according to Hayden, after Larwick reported James's conduct to Torrens, James "was furious that [Larwick] had gone behind his back and cut his sac," 9 RP at 1189, and that he had "an out and out vendetta against [Larwick]" from that point forward. 9 RP at 1243.
ś 100 Mason and Hayden also testified about specific comments James had made about Larwick, such as calling her a "bitch" and discussing whether she wore panties. 17 RP at 2465. But there was no testimony that James made similar comments to Collins, Mason and Hayden with such persistence and vehemence. In addition, although Collins noted James frequently crossed the line when using sexual innuendos in conversation, she testified that during her first year at the Training Center, her relationship with James was "good," and she sometimes joined in with James's "jovial banter" to stay on good terms with him. 12 RP at 1742, 1734. In contrast to Collins' initially amicable relationship with James, Larwick testified that she felt "very discriminated against the entire time" that she worked with James. 8 RP at 1054 (emphasis added). The record demonstrates that James's sexually harassing conduct toward Larwick continued even when she was recovering from the traumatic discovery that her then husband had been sexually molesting her daughter. The record also demonstrates that James told Collins "that he could finally get rid of the bitch," in reference to Larwick. 12 RP at 1739.
ś 101 All four Plaintiffs heard James's (1) references to female employees as "stupid wom[e]n," and "stupid bitch[es]," 5 RP at 641-42, 7 RP at 973; (2) remarks about the anatomy of female passersby, such as, "nice rack," 5 RP at 641, 7 RP at 963-64; (3) statements about needing more testosterone, while grabbing his crotch, 7 RP at 914, 972, 9 RP at 1197-98, (4) sexual innuendos such as, "Is it cold in here, or are you happy to see me?" 7 RP at 964; and (5) derogatory comments about the female employees' menstrual cycles, including, "She must be PMSing," and "Are you on the rag?" 7 RP at 971, 9 RP at 1199, 17 RP at 2472. Moreover, Hayden's and Mason's testimonies about James's targeting Larwick and having a particular vendetta against her is unrefuted; this testimony alone supports the jury's larger emotional damages award to Larwick and defeats the criteria for reducing the jury's verdict.
ś 102 Similarly unrefuted is evidence that James's conduct toward Larwick destabilized her life and caused her to withdraw from "the labor market of comparable earnings." CP at 894. Larwick testified that after her *1235 termination, she had recurrent nightmares about James's sexist and demeaning comments, stating, "I had no idea that this kind of language, this kind of treatment ... could be so draining, so stressful, and cause so much anxiety in my life." 7 RP at 988-89. She also explained that working with James caused her to suffer from insomnia, frequent headaches, and "severe neck pain." 7 RP at 989. In addition, Larwick's close friends and family members testified that the Training Center's "hostile environment" caused her to withdraw from friends and colleagues and to suffer from "uncharacteristic" depression, isolation, and pain related to stress. 8 RP at 1139.
ś 103 Thus, the record does not support the trial court's conclusory determination that substantial evidence failed to support the jury's damages award. Bunch, 155 Wash.2d at 179, 116 P.3d 381; RCW 4.76.030. On the contrary, the evidence, especially viewed in the light most favorable to the nonmoving party, namely, Collins and Larwick, shows that the trial court improperly substituted its opinion for that of the jury on a key question of fact. Strongly presuming that the jury's damages award is valid, we reverse the trial court's partial grant of Defendants' motion to remit and we remand to the trial court to reinstate the jury's verdict and damages award. See Bunch, 155 Wash.2d at 179, 116 P.3d 381 (citing Sofie, 112 Wash.2d at 654, 771 P.2d 711, 780 P.2d 260).

III. No Irregularity or Misconduct During Closing Argument
ś 104 Defendants also argue under CR 59(a) that the trial court abused its discretion in denying their motions for a new trial and remittitur. They contend that Boothe's closing argument comments constituted an irregularity or misconduct that materially affected their substantial rights and caused the jury to base its verdict on passion and prejudice. Specifically, they argue that these comments deliberately interjected evidence of the Fire District's insurance before the jury and improperly sent a message to the jury. We disagree.

A. Standard of Review
ś 105 As we note above, we review for abuse of discretion a trial court's denial of a CR 59(a) motion for a new trial. Sommer, 104 Wash.App. at 170-71, 15 P.3d 664. The test for determining such an abuse of discretion is whether "such a feeling of prejudice [has] been engendered or located in the minds of the jury" as to prevent the litigant from having a fair trial. Aluminum Co. of Am., 140 Wash.2d at 537, 998 P.2d 856 (quoting Moore, 89 Wash.2d at 942, 578 P.2d 26). Nevertheless, "absent an objection to counsel's remarks, the issue of misconduct cannot be raised for the first time in a motion for a new trial unless the misconduct is so flagrant that no instruction could have cured the prejudicial effect." Sommer, 104 Wash.App. at 171, 15 P.3d 664.

B. Improper Comment on Evidence
ś 106 In closing, Boothe argued that Plaintiffs' request for $1 million each for non-economic damages would appropriately compensate them for the pain and suffering "that's been experienced in the past" and they will experience "into the future" as a result of James's sexual harassment and gender discrimination. 30 RP at 4228. Boothe stated:
I'll leave you with the request that we are going to make for an award of $1 million in non-economic damages for each of the four claimants.
The amount that's being sought will not in any way reduce fire services, hurt the department. It's not going to do anything that will hurt services in any way, or raise taxes, do any of the bogeys that might be mentioned. It will not happen. We know that.

What you need to do, please, is put a value on their suffering that other departments will look up and say, "We can't do that." Put a value on what they have experienced and compensate them to a level that says, "If you do this, serious consequences flow, and we compensate *1236 people as they are injured." And in so doing, help let the commissioners know the answer to the question they felt had to go to you all to be decided. And in so doing, also let HR departments know that there's a better structure, there's a better way to do this.

HR departments don't exist for the protection of the City. HR departments don't exist for the protection of the company. Let them know that they have to be up there with a viable means for somebody who's experiencing harassment to step forward and bring it forth in a safe way. And an award of $1 million [to each of the four women] ... is the best way you can do that.
30 RP at 4245-47 (emphasis added). Defendants did not object to any portion of this argument either during, or immediately after, closing argument.
ś 107 Instead, they first raised the issue in their post-trial motions, after the jury had rendered its verdicts for Plaintiffs. The trial court denied the motions, ruling, "Taken together without objection, [the comment] is not so prejudicial to warrant the granting of a new trial." CP at 889. Although such remarks were improper, we agree with the trial court that they were not so prejudicial that a timely instruction could not have cured any prejudicial effect.

1. Reference to insurance
ś 108 Defendants argue that the trial court abused its discretion in denying their post-trial motions because "there can be no doubt that Boothe's comments during closing argument were a deliberate attempt on his part to inject the matter of the Fire District's liability insurance coverage into the trial." Br. of App/Cross Resp. at 27. They contend that Boothe's comments "urged the jurors to disregard the evidence before them" and to award a higher verdict than what they would have awarded "if they believed that the Fire District alone would be required to pay it." Br. of App/Cross Resp. at 28.
ś 109 But Defendants fail to support this argument with any briefing or legal authority beyond their bald proposition that "`the willful, deliberate, or collusive interjection'" of liability insurance into the case is grounds for reversal. Br. of App/Cross Resp. at 27 (quoting Kappelman v. Lutz, 141 Wash.App. 580, 590, 170 P.3d 1189 (2007), aff'd, 167 Wash.2d 1, 217 P.3d 286 (2009)). Furthermore, Defendants fail to argue how the jury would necessarily have interpreted Boothe's comment as referring to the Fire District's liability insurance. Under the Rules of Appellate Procedure, "an appellant's brief must include arguments supporting the issues presented for review and citations to legal authority." Bercier v. Kiga, 127 Wash. App. 809, 824, 103 P.3d 232 (2004), review denied, 155 Wash.2d 1015, 124 P.3d 304 (2005); see RAP 10.3(a)(6). Without supporting argument or authority, "an appellant waives an assignment of error," Bercier, 127 Wash.App. at 824, 103 P.3d 232 (citing Smith v. King, 106 Wash.2d 443, 451-52, 722 P.2d 796 (1986)); and "We need not consider arguments that are not developed in the briefs for which a party has not cited authority." Bercier, 127 Wash.App. at 824, 103 P.3d 232 (citing State v. Dennison, 115 Wash.2d 609, 629, 801 P.2d 193 (1990)). Thus, because Defendants failed to develop or to support their argument on this point, we need not consider it further.[23]

2. "Sending a message"
ś 110 Defendants also argue that Boothe attempted to "send a message" to the jury to direct the outcome of the case by *1237 appealing to the jury's "sympathy, passion, and prejudice." Br. of App/Cross Resp. at 30. In support, they assert that "Boothe specifically admitted to urging the jury to `send a message'" and that he "asked the jury to respect the harm incurred by [Plaintiffs] because to do otherwise would embolden other employers and supervisors, to act without regard to consequence." Br. of App/Cross Resp. at 30-31.
ś 111 But assuming, without deciding, that Boothe's comment was improper, Defendants failed to object or to request a curative instruction. Because they did not preserve this argument for appeal, we need not further consider it. RAP 2.5(a).
ś 112 Boothe's "argument was indirect" and "not addressed in such a manner as to incite the jury on beyond reasonable awards." CP at 889. And he specifically directed the jury to compensate Plaintiffs at an amount proportionate to their suffering by stating, "[P]ut a value on [Plaintiffs'] suffering that other departments will look up and say, `We can't do that.' Put a value on what they have experienced and compensate them to a level that says, `If you do this, serious consequences flow, and we compensate people as they are injured.'" 30 RP at 4246. On this basis, the trial court denied Defendants' post-trial motions, concluding that Boothe's comment, "[t]aken together without objection, is not so prejudicial to warrant the granting of a new trial."[24] CP at 889. We agree with the trial court.
ś 113 Defendants not only fail to show that Boothe's comments about fire services could reasonably have affected the jury's verdict, but they also fail to demonstrate that these comments were "so flagrant that no instruction could have cured the prejudicial effect." Sommer, 104 Wash.App. at 171, 15 P.3d 664 (quoting Warren v. Hart, 71 Wash.2d 512, 518-519, 429 P.2d 873 (1967)). Accordingly, we hold that the trial court did not abuse its discretion in denying Defendants' post-trial motions based on Boothe's comments during closing argument, especially in light of their failure to object and to request a curative instruction.

C. Passion and Prejudice
ś 114 Defendants also argue, based on Boothe's comments during closing argument, that the jury based its verdict on passion and prejudice. As we note above, Defendants did not properly preserve this issue for review by timely objection and request for curative instruction.[25] Defendants fail to persuade us that the trial court abused its discretion in denying their post-trial motions for a new trial and in granting only partial remittitur.

IV. Trial Court's Calculation of Attorney Fees
ś 115 Finally, Defendants argue that the trial court abused its discretion in awarding all four Plaintiffs $750,000 in attorney fees for Boothe's legal services. Defendants ask us to reverse the trial court's entire attorney fee award in its entirety and to remand to the trial court for further proceedings. They contend that this amount is excessive because (1) the $280 hourly rate that the trial court used is unreasonable, (2) the trial court awarded attorney fees for non-compensable time, (3) the trial court failed to reduce the award for time attributed to legal assistants, and (4) the trial court failed to reduce the award for redundant or inappropriate billing.
ś 116 On cross appeal, Collins and Larwick argue that the trial court abused its discretion in awarding attorney fees to Plaintiffs below the amount they had requested. Collins and Larwick contend that the trial court erred in (1) calculating the lodestar below the appropriate hourly rate; (2) reducing the attorney fees award for costs attributed to *1238 general overhead disbursements; and (3) failing to add a separate contingency multiplier.

A. Standard of Review
ś 117 We review a trial court's attorney fee award for a manifest abuse of discretion; we reverse an award only if the trial court exercised its discretion on untenable grounds or for untenable reasons. Pham v. City of Seattle, 159 Wash.2d 527, 538, 151 P.3d 976 (2007). Such is not the case here.

B. Attorney Fee Calculations
ś 118 The WLAD entitles plaintiffs who succeed on their claims to an award for reasonable attorney fees. Pham, 159 Wash.2d at 538, 151 P.3d 976 (citing RCW 49.60.030(2)). The party seeking an award for attorney fees bears the burden of proving that such fees are reasonable. Scott Fetzer Co. v. Weeks, 122 Wash.2d 141, 151, 859 P.2d 1210 (1993). In calculating this award, a trial court first determines a lodestar fee by multiplying a reasonable hourly rate by the number of hours reasonably expended. Pham, 159 Wash.2d at 538, 151 P.3d 976. A reasonable hourly rate reflects the market value of the attorney's services. Weeks, 122 Wash.2d at 149-50, 859 P.2d 1210 (citing Dan B. Dobbs, Awarding Attorney Fees Against Adversaries: Introducing the Problem, 1986 Duke L.J. 435, 467).
ś 119 After determining the lodestar, the trial court may then adjust the award upward or downward "to reflect factors not already taken into consideration." Broyles v. Thurston County, 147 Wash.App. 409, 452, 195 P.3d 985 (2008) (quoting Ross v. State Farm Mut. Auto. Ins. Co., 82 Wash. App. 787, 800, 919 P.2d 1268 (1996), rev'd on other grounds, 132 Wash.2d 507, 940 P.2d 252 (1997)). Trial courts may adjust the lodestar "to account for a number of subjective factors," including the time expended on the case, the difficulty of the questions involved, the skill required, the customary hourly rate of other attorneys, the amount involved, the benefit resulting to the client, the contingency or certainty in collecting the fee, and the character of the employment. Weeks, 122 Wash.2d at 150, 859 P.2d 1210. Additionally, the trial court "`should discount hours spent on unsuccessful claims, duplicated or wasted effort, or otherwise unproductive time.'" Pham, 159 Wash.2d at 538, 151 P.3d 976 (citing Bowers v. Transamerica Title Ins. Co., 100 Wash.2d 581, 597, 675 P.2d 193 (1983)). "The hours reasonably expended must be spent on claims having a `common core of fact and related legal theories.'" Pham, 159 Wash.2d at 538, 151 P.3d 976 (quoting Martinez v. City of Tacoma, 81 Wash.App. 228, 242-43, 914 P.2d 86 (1996)).
ś 120 Although trial courts presume that a lodestar represents a reasonable fee, "occasionally a risk multiplier will be warranted because the lodestar figure does not adequately account for the high risk nature of a case." Pham, 159 Wash.2d at 542, 151 P.3d 976. "In adjusting the lodestar to account for this risk factor, the trial court must assess the likelihood of success at the outset of the litigation." Pham, 159 Wash.2d at 542, 151 P.3d 976 (quoting Bowers v. Transamerica Title Ins. Co., 100 Wash.2d at 597, 675 P.2d 193). Although this calculation is necessarily imprecise "`and must largely be a matter of the trial court's discretion,'" the trial court should determine whether the hourly-rate underlying the lodestar fee already comprehends an allowance for the contingent nature of the fees. Pham, 159 Wash.2d at 542, 151 P.3d 976 (quoting Bowers, 100 Wash.2d at 598-99, 675 P.2d 193).

1. Hourly rate
ś 121 Defendants argue that the trial court abused its discretion in ruling that $280 is a reasonable hourly-rate for Boothe's services when the appropriate rate "should not exceed $225." Br. of App/Cross Resp. at 34-35. Based on declarations from their witnesses, Defendants contend that an hourly-rate of $210-225 is reasonable for employment litigation cases in Clark County. On cross appeal, Collins and Larwick counter *1239 that the trial court erred in limiting the hourly-rate amount to $280 because declarations from Plaintiffs' witnesses demonstrate that a $300 hourly-rate is a reasonable and customary amount.
ś 122 The record demonstrates that in determining a reasonable hourly-rate, the trial court properly accounted for subjective factors, including the market value, the skill level involved, the complexity of the case, the customary rate of fees, the risk of contingency, and the benefit to Plaintiffs. See Weeks, 122 Wash.2d at 150, 859 P.2d 1210. When it calculated the hourly-rate amount, the trial court specifically noted that the "highly specialized field" and the "substantial risk" involved in Boothe's representation of Plaintiffs, and it set the lodestar at an amount within the range of the evidence presented in both parties' motions, supporting affidavits, and declarations. CP at 896-97. Contrary to Plaintiffs' request to set the rate for attorney fees at $300 per hour, the trial court set the rate at $280 per hour, concluding that this amount "appears to be within the range of reasonable fees," since plaintiffs in this type of case "generally fac[e] a well-financed defendant and the cases are difficult to try and represent a substantial risk." CP at 896-97. The trial court also noted that although $250 may be the average rate for attorney fees in Clark County, local standards do not control under the circumstances because typically plaintiff's counsel "in this highly specialized field often would be from Seattle or Portland where they're with firms more highly specialized in this type of case and case management." CP at 897.
ś 123 The record also shows that the trial court properly subtracted Boothe's time spent on unsuccessful claims and the cost of overhead. CP at 897-99; see Broyles, 147 Wash.App. at 452, 195 P.3d 985. In calculating the reasonable hourly rate, the trial court excluded the hours Boothe spent on unsuccessful claims in attempting to link the County and the City as employers. The trial court also excluded the clerk's time, copying costs, Kinko's costs (other than discovery responses) and word processing as "over-head" costs, which are inherent in the reasonable hourly rate. CP at 895. The trial court subtracted $21,068 total for these non-compensable costs from Boothe's proffered bill. We hold that the record shows that, after accounting for subjective factors and reductions for non-compensable time and costs, the trial did not abuse its discretion in determining that $280 was the reasonable hourly-rate.
ś 124 On cross appeal, Collins and Larwick argue that the trial court abused its discretion in failing to grant Plaintiffs' request for a lodestar multiplier to account for the high risk nature of the case and the financial risk that Boothe assumed in representing Plaintiffs during more than three years of litigation. In its memorandum decision, the trial court discussed the contingency risk factor and explained how it affected the lodestar rate. The trial court found that Boothe "funded the case in total as none of the plaintiffs had the ability to assist, and his records would reveal that approximately $160,000 of his own funds were used in financing the case." CP at 897. The trial court also found that if the jury had returned a verdict in Defendants' favor, "counsel would have little or no opportunity to be reimbursed by his clients and as such, because of this high contingency, a lodestar figure has been accepted as an appropriate way to insure[sic] that these parties will be appropriately represented by counsel and have the ability to bring their claim to an ultimate resolution before a jury." CP at 897.
ś 125 Thus, the record shows that the trial court carefully considered the contingency factor and took it into account in setting the hourly-rate, making it unnecessary to apply a separate contingency multiplier. A contingent multiplier is not warranted when, as here, the hourly-rate underlying the lodestar fee "already comprehends an allowance for the contingent nature" of the fees. Pham, 159 Wash.2d at 542, 151 P.3d 976. Because the trial court specifically noted that its lodestar rate already comprehends the "high contingency" of the case, CP at 897, we hold that *1240 it did not abuse its discretion in failing to apply an additional multiplier for the same risk of contingency.

2. Non-compensable time

a. Unsuccessful claims
ś 126 Next, Defendants argue that the trial court abused its discretion in failing to deduct non-compensable time for Plaintiffs' claims of outrage, negligence, constructive discharge, and retaliation. Defendants contend that (1) "[a]lthough these claims may have been based on a number of facts essential to the overall lawsuit, the law pertaining to the dismissed claims differed from the law pertaining to the WLAD claims," Br. of App/Cross Resp. at 39; and (2) Plaintiffs failed to prove the reasonableness of their fees because Boothe's "block-billing" method "combined numerous tasks into a single time entry," which prevents the "effective segregation" of unsuccessful claims. Br. of App/Cross Resp. at 40; CP at 729. These arguments fail.
ś 127 As noted above, the trial court already subtracted $21,000 from Plaintiffs' proposed attorney fees award for time spent on unsuccessful claims, and it deducted $74,068 from Plaintiffs' requested amount of compensation for attorney fees and costs. Furthermore, Defendants fail to point to a single example of Boothe's so-called "block-billing" method in the 225 pages of billing records that Boothe submitted to the trial court. Br. of App/Cross Resp. at 40. Thus, Defendants fail to demonstrate that the trial court abused its discretion in setting the amount by which it reduced Plaintiffs' attorney fee award for time spent on other unsuccessful claims.

b. Legal assistants
ś 128 Next, Defendants argue that the trial court abused its discretion by including time that Boothe's legal assistants spent on the case because Plaintiffs failed to show that Boothe employed "qualified" legal assistants to perform "substantive legal work." Br. of App/Cross Resp. at 41. Beyond these broad assertions, however, Defendants fail to show how Boothe's legal assistants were unqualified. Defendants also fail to support their arguments with citations to the record or legal authority, contrary to RAP 10.3(a)(6). Therefore, we do not further consider this argument. See Bercier, 127 Wash. App. at 824, 103 P.3d 232.

3. "Overhead" costs
ś 129 Lastly on cross appeal, Collins and Larwick argue that "[t]he trial court impermissibly denied Plaintiffs recovery for `clerk's time, copying costs [] other than response to discovery: [sic] and word processing." Br. of Resp/Cross App. at 41. Specifically, they urge us to adopt Oregon's practice of awarding attorney fees for "expenses specially billed to the client" as long as such expenses are "properly documented" and "reasonable." Br. of Resp/Cross App. at 43, citing Willamette Prod. Credit Ass'n v. Borg-Warner Acceptance Corp., 75 Or.App. 154, 158-59, 706 P.2d 577 (1985), review denied, 300 Or. 477, 713 P.2d 1058 (1986). Collins and Larwick cite to Willamette Prod. Credit Ass'n, an Oregon case for the proposition that, in addition to an attorney's hourly charge, an award for attorney fees may properly include the costs incurred for secretarial work, photocopies, long-distance telephone conversations, and postage. See Br. of Resp/Cross App. at 43.
ś 130 But here, as the trial court concluded, Boothe's hourly rate for services includes the value of such "overhead" expenses; therefore, no separate compensation is necessary. CP at 898. In analyzing Defendants' post-trial motions, the trial court determined,
In going through the billings, I am disallowing clerk's time; copying costs; Kinko[sic] costs, other than response to discovery; and word processing as all of these costs are inherent with the reasonable attorney fees hourly charge as that takes into account certain costs of overhead.
CP at 898. Defendants fail to present any Washington case law that would otherwise *1241 call this ruling into doubt. Unpersuaded by the Oregon case law Defendants cite, we hold that the trial court did not abuse its discretion in calculating the attorney fees award for Plaintiffs.

V. Attorney Fees on Appeal
ś 131 Collins and Larwick request attorney fees on appeal under RAP 18.1, noting that RCW 49.60.030(2) entitles persons injured by an act in violation of WLAD to reasonable attorney fees. They assert that this includes "fees on appeal to discrimination victims, provided they are [the] substantially prevailing parties." Reply Br. of Resp/Cross App. at 28. We agree.
ś 132 Under RCW 49.60.030(2) and RAP 18.1(a), a plaintiff who prevails on a gender discrimination suit is entitled to reasonable attorney fees in the trial court and on appeal. Blaney v. Int'l Ass'n of Machinists, 151 Wash.2d 203, 217, 87 P.3d 757 (2004). A party who substantially prevails on appeal is entitled to an award for attorney fees on appeal. Day v. Santorsola, 118 Wash.App. 746, 770-71, 76 P.3d 1190 (2003). Generally, the prevailing party is the party who receives an affirmative judgment in his or her favor. But if neither party wholly prevails, "then the determination of who is a prevailing party depends upon who is the substantially prevailing party, and this question depends upon the extent of the relief afforded to the parties." Day, 118 Wash. App. at 770-71, 76 P.3d 1190. Because Collins and Larwick are the prevailing party in this case, we award them attorney fees and costs on appeal.
ś 133 We affirm the trial court's denial of Defendants' motions for a new trial and partial denial of their motions for remittitur to redetermine the jury's damages awards. We reverse the trial court's remittitur reduction of Larwick's jury awards for economic and non-economic damages and remand to the trial court for reinstatement. In addition, we reverse the trial court's remittitur reduction of Larwick's jury award for non-economic damages and remand to the trial court to reinstate this award to her. We affirm the trial court's attorney fees awards to all four Plaintiffs. And we award attorney fees and costs on appeal to Collins and Larwick.
ś We concur: PENOYAR, A.C.J., and QUINN-BRINTNALL, J.
NOTES
[1] Although the record on appeal does not include complete information about Hayden's and Mason's dates of employment at the Training Center, it indicates that Hayden worked there from July 2000 to February 2004; and Mason worked there from December 2001 to November 2003.
[2] James served as the Fire District's human resources contact until the end of 2003.
[3] Larwick first met Kellogg at the Training Center in 2001 when Kellogg and a colleague were teaching a course for Training Center employees about workplace conflict intervention and mediation.
[4] For example, Collins sent James an email depicting a business logo for "Stiff Nipples Air Conditioning Service," in which she wrote, "YOU'LL [sic] like this air conditioning Company's name!!" Ex. 103. She also emailed photographs to James of damaged cars under the caption, "Women just can NOT [sic] drive a car"; these photographs depicted several women in the nude. Ex. 123.
[5] The trial court played Dr. Cyril Dodge's videotaped deposition testimony for the jury and admitted the disc containing this testimony as Exhibit 308. Although the trial court stated on the record that the transcript of this testimony "is Attachment #3," the Deposition of Dr. Dodge appears in the record on appeal as "attachment no. 2." See 14 RP at 2121-22; RP (Dodge Dep.) Sept. 14, 2006. Accordingly, we cite to Attachment No. 2 for Dr. Dodge's deposition testimony.
[6] In these claims, all four plaintiffs alleged that the Fire District and James created a hostile work environment and that the Fire District failed to correct James's sexually harassing conduct. Larwick and Mason alleged retaliatory termination on the basis of gender, and Mason and Hayden alleged constructive discharge. In addition to these claims against the Fire District and James, Collins alleged that the City had negligently supervised James.
[7] After finding the City responsible for 50 percent of the negligence, the jury further divided this percentage between the Fire District and the City, attributing 75 percent fault to the Fire District and James and 25 percent fault to the City.
[8] CR 59(a)(1) and (2).
[9] CR 59(a)(5). More specifically, Defendants argued that (1) "[t]he jury indiscriminately gave each plaintiff an award near or at the top of the range regardless of her personal circumstances" and (2) Plaintiffs should not receive damages for back pay when they could have returned to work earlier. CP at 285.
[10] CR 59(a)(9).
[11] CR 59(a)(7).
[12] The trial court noted that "sending a message" is historically "an effort to persuade the jury to award punitive damages, which is not permitted in the State of Washington." CP at 889.
[13] Allowing two and one half years for lost wages, the trial court reduced the jury's lost wages award to $110,000, and it reduced the jury's lost pension benefit award to $40,000.
[14] The trial court noted that (1) Hayden lost her home, became "totally disabled," and could not find employment due to her worsening symptoms of multiple sclerosis; (2) the Fire District commissioners "were well aware of her condition"; and (3) given Hayden's long-term employment at the Fire District, "the jury could well determine that [Hayden] would have continued to be employed if it wasn't for the actions by defendants in creating such a hostile environment," which made it "impossible for [Hayden] to continue employment." CP at 891-92.
[15] The trial court included in the attorney fees calculation the hours that legal assistants spent on the case because "without question their hours shown in the billing were devoted to the case," and these hours do not appear unreasonable. CP at 898.
[16] The amount of damages to which a litigant is entitled is ordinarily a factual question for the jury, the constitutionally designated fact-finder. The jury's role as fact-finder is perhaps even more essential when determining amounts of "non-economic damages." Bunch, 155 Wash.2d at 179-80, 116 P.3d 381 (citing Sofie, 112 Wash.2d at 646, 771 P.2d 711, 780 P.2d 260).
[17] "There must be `substantial evidence,' as distinguished from a `mere scintilla' of evidence, to support the verdictâ i.e., evidence of a character `which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed.'" Sommer, 104 Wash.App. at 172, 15 P.3d 664 (quoting Hojem v. Kelly, 93 Wash.2d 143, 145, 606 P.2d 275 (1980)).
[18] Defendants do not challenge Collins' award for non-economic damages.
[19] Defendants also contend that Collins failed to mitigate her damages when she abandoned the business venture after Boothe advised her to put the "kibosh" on it. Br. of App/Cross Resp. at 12; 14 RP at 2006. The only mention of this fact appears in Caldwell's notes where she wrote, "[Collins] was depressed after lawyer put kibosh on her starting business." 14 RP at 2006. But Caldwell testified that because her notes contained no quotation marks, they reflected her (Caldwell's) own words and interpretations rather than those of Collins. Moreover, about her conversations with Collins, Caldwell testified, "I don't know where that came from. I do not recall saying that to her." 14 RP at 2061.
[20] Collins decided not to return to the Training Center because of concerns about how it would affect her mental health, concerns that her husband and doctors shared.
[21] We again note that the trial court substantially granted Defendants' motions for remittitur on Larwick's economic damages award.
[22] Defendants counter that the trial court did not err in reducing Larwick's damages because substantial evidence did not support the jury's verdict and "the jury based its verdict on passion and prejudice." Reply Br. of App/Cross Resp. at 2.
[23] Nevertheless, we note that the jury could have interpreted Boothe's commentâ that a damages award would not reduce fire servicesâ as a statement about the Fire District's financial standing or financial backing from other government entities, like the City, which would have been improper. In determining that Boothe did not improperly comment on insurance, the trial court explained that (1) Boothe's "indirect" comment about fire services "was one very small portion" of his overall argument, and (2) he did not attempt to set forth monetary issues other than those related to Plaintiffs' injuries. CP at 889.
[24] The jury considered this "one very small portion" of Boothe's closing argument along with the trial testimony of more than 50 witnesses during the four week jury trial. See CP at 889.
[25] Nevertheless, even were we to consider this issue, Defendants fail to show that Boothe's comment or passion or prejudice influenced the jury's verdict.