# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Parenting and Support of:<br><br>KOLTON GORDON-SERVEN,<br><br>                           Child.<br><br>JANENE GORDON,<br><br>          Appellant/Cross-Respondent,<br><br>     v.<br><br>SCOTT K. SERVEN,<br><br>          Respondent/Cross-Respondent. | No. 59363-7-II<br><br><br><br>ORDER CHANGING CAPTION |

Appellant/Cross-Respondent, Janene Gordon, moves this court to change the caption in its October 14, 2025 unpublished opinion to insert the minor child's initials. After consideration, we grant the motion. The minor child's full name shall be deleted from the caption and replaced with the initials "K.G.-S." It is

SO ORDERED.

Panel: Jj. Maxa, Veljacic, Che

_____
Veljacic A.C.J

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Parenting and Support of: | No. 59363-7-II |
| KOLTON GORDON-SERVEN, | |
| Child. | |
| JANENE GORDON, | |
| Appellant/Cross-Respondent, | UNPUBLISHED OPINION |
| v. | |
| SCOTT K. SERVEN, | |
| Respondent/Cross-Respondent. | |

VELJACIC, A.C.J. — Janene Gordon, the mother of K.G.-S., appeals the trial court's order entering a final parenting plan and child support order following remand. She argues the trial court erred in holding a new trial and not considering the best interests of K.G.-S. or his expressed wishes. She also argues the court erred in not adopting the guardian ad litem's (GAL's) recommendation, making findings against her under RCW 26.09.191(3), and awarding joint decision-making to Scott Serven, K.G.-S.'s father. She contends the trial court had no authority to order retroactive child support be placed into a trust for K.G.-S. and that she should have been awarded more attorney fees.

Serven cross-appeals and argues the court erred in concluding it had no discretion to award child support prospectively only. He also argues that, if we reverse joint decision-making, we

should award him sole decision-making. Because the trial court did not abuse its discretion, we affirm the final parenting plan, child support order, and attorney fee award.

FACTS

Gordon and Serven began dating in 2013. In April 2015, Gordon and Serven had a child, K.G.-S. Their relationship ended in 2018. Then, in 2019, Gordon petitioned for a parenting plan and child support order.

After trial, in March 2021, the trial court entered a final parenting plan and child support order. The court awarded Gordon and Serven 50/50 residential time with alternating weeks and joint decision-making. The court imputed Gordon's gross monthly income at $5,664.94 and found Serven's monthly net income to be $66,897.70.

I.      PREVIOUS APPEAL

Gordon appealed, and this court reversed the court's parenting plan, child support order and attorney fee award. *In re Parenting & Support of K.G.-S.*, No. 55619-7-II, (Wash. Ct. App. Dec. 13, 2022) (unpublished), http://www.courts.wa.gov/opinions/. This court held that the trial court abused its discretion in allocating joint decision-making and ordering a 50/50 residential schedule because the court failed to properly consider the required statutory factors. *Id.* slip op. at 12-13. This court also found that the trial court's findings regarding the 50/50 schedule were not supported by substantial evidence. *Id.* slip op. at 15. Specifically, it determined that it was untenable for the trial court to rely on the fact that Gordon "depriv[ed] Serven of 'residential time' before any temporary or permanent parenting plan was ever established" because Serven could have petitioned for a parenting plan at any time during the first four years of K.G.-S.'s life. *Id.* slip op. at 18.

The court also held that it was inappropriate for the trial court to rely on its finding that Gordon's parenting ability "was poor in part because [s]he had no satisfactory explanation" for her son from a previous relationship choosing to reside with his father instead of her. *Id.* (internal quotation marks omitted). This inappropriate consideration demonstrated gender bias against Gordon and was held to be an abuse of discretion. *Id.* slip op. at 19.

Regarding child support, this court determined that the $6,650 in gross monthly income imputed to Gordon was not supported by substantial evidence. *Id.* slip op. at 23. The trial court's findings that Serven made $66,898 in monthly income was upheld. *Id.* slip op. at 21-22. This court reversed the child support order setting child support payments at $3,500 per month because K.G.-S. was entitled to a higher standard of living in Gordon's home based on Serven's income, and $3,500 was an unreasonable amount. *Id.* slip op. at 25.

After trial, Gordon sought almost $80,000 in attorney fees, and the trial court awarded $16,500 of these fees but made no written findings regarding the award. *Id.* slip op. at 26. Gordon also sought $11,465 in attorney fees in connection with a motion Seven filed regarding K.G.-S.'s school. *Id..* The court awarded Gordon $1,000 of this request. *Id.*

Based on the financial disparity between the parties, this court held that the amount of fees awarded to Gordon was unreasonable. *Id.* slip op. at 27-28. The court also granted Gordon's request for attorney fees on appeal.[1] *Id.* This court reversed and remanded "for proceedings consistent with [its] opinion" and directed that the proceedings be held before a different judge. *Id.* slip op. at 28.

---

[1] On January 13, 2023, a commissioner of this court awarded Gordon $54,490.50 of the requested $71,745.50 in appellate attorney fees. Ruling, *K.G.-S.*, No. 55619-7-II (Wash. Ct. app. Jan. 13, 2023). Gordon filed a motion to modify the commissioner's ruling, and a panel of this court granted her motion and awarded the full amount of her appellate attorney fees.

II. ON REMAND

After remand, Gordon filed a "Motion for Entry of Orders in Conformance with Court of Appeals Mandate" and requested that her proposed parenting plan be adopted. Serven responded to this motion and requested a new trial due to the amount of time that had passed since the initial trial. The trial court granted a new trial and appointed a GAL.

Gordon also filed a motion for attorney fees in conformance with the court of appeals mandate. The court awarded Gordon $92,762.03 in attorney fees for the 2021 trial and post-trial motion. On reconsideration, the court reduced this amount to $67,556.89 that included an offset for the $17,500 in attorney fees Serven had already paid. The court also offset $5,128 for duplicative, unnecessary, and administrative work completed by three different law firms prior to trial.

In May 2023, a temporary parenting plan was entered that ordered Serven to have residential time from Thursday after school to Monday and then the following week from Thursday after school to Saturday. This schedule was to alternate weekly thereafter. During the summer, Gordon and Serven had a shared residential schedule that alternated weekly. Gordon was given sole decision-making on tutoring and non-emergency healthcare. Gordon and Serven were given joint decision-making on school choice and counseling.

In September, Gordon filed in this court a motion to recall the mandate which was denied. *See* Revised Mot. to Recall the Mandate, *In re Parentage of K.G.-S.*, No. 55619-7-II (Wash. Ct. App. Sept. 29, 2023); Ord. Den. Mot. to Recall Mandate, *In re Parentage of K.G.-S.*, No. 55619-7-II (Wash. Ct App. Nov. 8, 2023).

On October 12, Serven was ordered to pay Gordon $18,000 in previously incurred attorney fees and $15,000 as an advance for trial attorney fees.

On December 8, the trial court ordered Serven to pay $15,000 to Gordon as an advance for trial attorney fees. The court also ordered the parties to attend mediation. The court ordered $1,925 of the $15,000 for mediation preparation and attorney attendance at mediation.

On December 20, the parties attended mediation. However, Gordon's attorney of record did not attend the mediation.

On December 22, Gordon's attorney filed a notice of intent to withdraw and a motion to continue the trial date. On December 28, Gordon's attorney filed a notice of withdrawal, motion to continue, and request for stay of proceedings pending motion for recusal and change of venue.

Trial was continued multiple times and ultimately set for January 2, 2024. On January 3, Gordon's counsel's notice of intent to withdraw was voluntarily withdrawn. The trial court denied Gordon's motion to continue, but did continue trial to January 8, because on the day of trial, Gordon's counsel represented that she tested positive for COVID-19. The court ordered that for the time frame between January 2 and January 8, the parties were not to file any new motions, conduct any discovery, generally, request no attorney fees, and identify no new witnesses.

III.    TRIAL

On January 8, the parties proceeded to a bench trial.

A.    GAL interviews and recommendation

The GAL testified that she interviewed eight-year-old K.G.-S. for the first time in his bedroom at Serven's house with the door slightly open. She stated that when she asked questions about Serven, K.G.-S. kept getting up to look out the door before he answered and that he would whisper his answers. On cross-examination, the GAL stated she did not know why K.G.-S. was checking the door and exhibiting anxiousness and that it could have been because he was alone

6

with a stranger in his bedroom. The GAL also stated that K.G.-S. could have been dishonest in his responses or could have been coached to provide certain responses.

The GAL found that K.G.-S. was more closely bonded with Gordon and her report stated that K.G.-S. "said he would like to be at his dad's house for 2 or 3 days and at his mom[']s for 12 or 11 times. Or maybe 13 or 14 or 16 or 20 days before 2 or 3 days at his dad's house. Then he said maybe just 2 days at his dad's house." Ex. 51, at 9. The GAL also testified that the parties agreed K.G.-S. exhibited signs of anxiety but disagreed as to why he displayed these symptoms. Serven testified that he saw anxiety and stress in K.G.S. following phone calls with Gordon and that he felt like K.G.-S. felt responsible for Gordon's happiness.

The GAL stated in her report that both parties agreed K.G.-S. was struggling in school and that his test scores and grades indicated he required urgent intervention.

The GAL's report had a summary of her interviews with Gordon's adult children, Bailey and Wyatt, that spanned almost eight pages. The GAL did not interview Serven's two adult sons, Jeff and Shawn, and did not independently interview Nora Serven, his wife, or her son, Jose Miguel. The GAL did interview Nora Serven's 13-year-old daughter.

Serven's counsel asked the GAL if she thought an eight-year-old boy was "sufficiently mature to express reasoned and independent preferences for his own residential schedule?" Rep. of Proc. (RP) (Jan. 8, 2024) at 177-78. The GAL responded:

> I believe that he's old enough, and he seemed able to articulate the reasons why he wanted the schedule that he wanted.
>     But I don't think that that alone would be enough. I think that I would have to be looking at a lot of different factors, of course. He may feel that way for many reasons that may not be wholly supported.

RP (Jan. 8, 2024) at 178. The GAL also agreed that K.G.-S.'s descriptions of facts were very inconsistent with regard to certain subjects.

7

Serven testified about his interview with the GAL. He stated that the GAL put down things he said, interrupted him, and laughed at his responses.

The GAL ultimately recommended that K.G.-S. reside primarily with Gordon and that Serven have every first, third, and when applicable, fifth weekend of every month. The GAL also recommended that Gordon have sole decision-making.

B.      RCW 26.09.191 factor evidence

Serven testified that he went to Gordon's home to pick up K.G.-S. and his birth certificate to make a copy of it.[2] Gordon filmed Serven ringing her doorbell and standing on her porch. She told Serven she did not have it. She testified that this meant she did not have it "in [her] hand" but that it was inside her home. RP (Jan. 10, 2024) at 428.

Gordon sent Serven numerous e-mails requesting that K.G.-S. be placed in counseling. Serven responded asking Gordon to share what she was seeing in K.G.-S. that made her think he would benefit from counseling. Serven added that when K.G.-S. was in his home, he was happy and secure. Gordon responded and accused Serven of staging photos as he did in court and stated that she is "not interested in going back and forth with [him] on [the counseling] matter." Ex. 21, at ex. 3. Despite Gordon's expressed concern for K.G.-S.'s emotional well-being, she did not request mediation. Gordon's stated reason for not requesting mediation was that she could not financially afford it.

Gordon also requested tutoring for K.G.-S. Serven responded, "It seems to me that if we both step up our game, we can have time better spent on improving [K.G.-S.'s] education as opposed to the time it would take to drive and put [K.G.-S.] into classes. Are you willing to

---

[2] The first copy Gordon sent was taken as a picture on the phone, and it was not lying flat in the photograph.

consider this approach?" Ex. 133A. Gordon was not responsive to this question. Serven stated that he would rather work on K.G.-S.'s schooling himself on a one-on-one basis. Serven also expressed concerns about K.G.-S. eating processed foods at Gordon's home. Gordon accused Serven of tampering with the e-mail chain, "spin[ning]" things, and having no intention of helping K.G.-S. with his homework. Ex. 133A.

Serven responded again expressing concern about K.G.-S.'s nutrition and asked Gordon to work with him for K.G.-S.'s benefit. Serven suggested creating a meal plan for K.G.-S. and stated: "After a month or so of proper nutrition, he may be ready for tutoring. I'm willing to pay for tutoring visits once a week here in Gig Harbor if you are willing to work with this plan." Ex. 133A.

Gordon testified that Serven sent her an e-mail asking if she would be willing to schedule her three-week vacation time with K.G.-S. so Serven could sign K.G.-S. up for a sailing class. Gordon's reason for not responding to Serven's e-mail was because they "were in the trial court back on remand" and she viewed this as conflict. RP (Jan. 10, 2024) at 604.

Serven also testified that when he first began having 50/50 residential time in 2021, Gordon refused to send K.G.-S.'s iPad with him so he could access his homeschooling platforms. Serven testified that the passwords Gordon gave him were incorrect and that having the iPad would have been beneficial for K.G-S.

C.    Child Support

Gordon requested $10,000 per month in child support. The following exchange took place regarding what Gordon spent child support payments on.

> [COUNSEL:] So, if Mr. Serven was paying you $3[,]500 per month beginning March of 2021 and you only earn $16 in earned interest income, isn't it true that Mr. Serven—or excuse me—Mr. Serven's funds for child support were not only paying [K.G.-S.]'s needs but were paying for some of your expenses?

9

[GORDON:] Living expenses, as a whole, yeah, to keep the household, yeah.

. . . .

[COUNSEL:] Okay. And so some of the money that Mr. Serven was paying you in child support for [K.G.-S.] was funding your family and your household as a whole; correct?

[GORDON:] If you want to say it that way, I mean, it was—

[COUNSEL:] I do. So that's correct; yes or no?

[GORDON:] It could be in a way. . . . It was contributing to our household.

RP (Jan. 10, 2024) at 527-28. Counsel asked Gordon why she had not spent the $3,500 child support payments on extra things for K.G.-S., such as taking him to Disneyworld, as she had testified she would in the 2021 trial. Gordon responded and the following exchange took place:

[GORDON:] I—essentially I had to put the—make the main things the—make things which is I had to pay the essentials first to take care of the main stuff. Like we didn't—we don't have extras to go other places and do things. It's just not there.

. . . .

[COUNSEL:] So do you believe that [K.G.-S.]'s child support is intended to make your car payment?

[GORDON:] No. But I think a portion of having to pay my monthly payment, if you break all of that up to what it takes to operate and do the functions, you know, part of gas money, driving from here and there, my electric bill, power bill, a little portion of that. You know, just—it gets—and then high attorney fees.

. . . .

[COUNSEL:] Okay. So it's your testimony that during the course of that period you did not have enough money from Mr. Serven to engage in the activities that you told the trial court you were going to engage in.

[GORDON:] That I would like to had I had the [$]10,000, yes.

[COUNSEL:] Okay. So the [$]3,500 wasn't enough; correct?

[GORDON:] Not with what everything going on.

. . . .

[COUNSEL:] And part of that everything going on, as you just testified, was your high attorney's fees; correct?

[GORDON:] That's one of the equations.

[COUNSEL:] Okay. How many—how much of that $3[,]500 a month do you anticipate or would you estimate went to attorney's fees?

[GORDON:] None of those portions from his child support went to attorney fees.

[COUNSEL:] I thought you just testified that they did?

[GORDON:] It would have a portion out of my credit card or my all-in-one loan that I would have had to take from.

. . . .

10

[GORDON:] What I was referencing towards Mr. Serven's child support amount is that it's—I can't pinpoint exactly where that money is going to. It goes all over to keep things moving—to keep my household going and get [K.G.-S.] going and keep—it contributes to my household.

[COUNSEL:] Does it also contribute to your personal expenses?

[GORDON:] I would have to go—I mean, it just goes into an account and then I pay certain things through that account.

RP (Jan. 10, 2024) at 532-33, 535-36, 539-540.

IV.     FINDINGS AND FINAL ORDERS

A.     Parenting Plan

The trial court's findings of fact in its final parenting plan included the following:

9.4  [K.G.-S.] was five years old when the 2021 Parenting Plan was entered. [K.G-S.] was in Kindergarten. [K.G-S.] is eight years old at the time of the 2024 trial.
. . . .
9.6  Since the 2021 trial, 30.5 months passed under the original parenting plan and 50/50 schedule as well as the court's May 2023 temporary parenting plan. The passage of 30.5 months is a significant amount of time in a young child's life. Over that time, there was significant growth and development of K.G.-S. from a five-year-old to an eight-year-old.
9.7  No GAL was appointed in connection with the 2021 trial. The Court determined that, on remand, it needed a [GAL] to provide the Court with current information from entry of the March, 2021 parenting plan to present. The Court determined it could not rely exclusively on the 2021 record as the child is now eight-years-old, has had nearly three years of a 50/50 parenting plan (or at least the time from trial to the time the schedule changed under the temporary parenting plan).
. . . .
9.10  Portions of the GAL report were lacking, and in some aspects, showed a bias towards Ms. Gordon.

Clerk's Papers (CP) at 735-36. The court noted that the GAL spent "significantly more time interviewing members of Ms. Gordon's household than Mr. Serven's household." CP at 736.

9.10 . . . . (iv)—The GAL did not, but should have, conduct[ed] a one-on-one interview with Mrs. Serven. Not only would her observations have been relevant, but her involvement with [K.G.-S.] was important information that was not considered by the Court in 2021. The GAL's reason for not interviewing Mrs. Serven one-on-one was concerning and not well explained.

11

(viii) The GAL had not met [K.G.-S.] prior to interviewing him at Mr. Serven's home. She chose to interview [K.G.-S.] alone in his bedroom with the door slightly ajar. The choice to interview a young child in his bedroom for a first interview is a little odd. [The GAL's] impression during her interview of [K.G.-S.] was that he was afraid that his father may overhear what he was saying about him and kept checking the outside door to make sure no one could hear what he was saying. The Court is concerned that [K.G.-S.] may have actually been uncomfortable being in a bedroom with a stranger, which may have impacted his responses.

(ix) The GAL placed significant weight on [K.G.-S.'s] expressed opinion about which parent he wanted to spend time within her recommendation to the court. [K.G.-S.] is only eight years old, and nothing provided by the GAL gave the Court the impression that [K.G.-S.] had the maturity level supporting that his opinion should be relied upon as to what would be in his best interest.

(x) The Court finds portions of the GAL report helpful, but places less reliance on the GAL report when it comes to the credibility of the Parties.

CP at 736-37. The court found Serven's testimony credible and that aspects of Gordon's testimony were less credible. The court also found that Serven embraced his residential time with K.G.-S. and tried to work with Gordon on issues she raised including education, homework, tutoring, and counseling.

9.20 Ms. Gordon's testimony in the 2024 trial focused mostly on what she believed Mr. Serven was doing wrong. Her 2024 trial testimony highlighted her animosity towards Mr. Serven and her laying blame on him for causing [K.G.-S.] to be anxious and performing poorly/failing in school. Ms. Gordon was primarily critical of Mr. Serven because he disagreed with her as to [K.G.-S.]'s need for outside tutoring and her belief that [K.G.-S.] needed counseling for anxiety. Ms. Gordon asserted that [K.G.-S.] was excelling in school when with her exclusively and he is no longer doing so.
. . . .
9.22 Ms. Gordon was unresponsive to Mr. Serven's inquiries to Ms. Gordon as to the child's behaviors she was seeing in her home that supported her opinion that he needed counseling as he was not seeing those behaviors in his home. Ms. Gordon was unresponsive to Mr. Serven's offer for tutoring after focusing on [K.G.-S.]'s nutrition for one month. A[n] exhibit admitted into evidence supports that she was not responsive regarding tutoring. Ms. Gordon was unresponsive to Mr. Serven's request to enroll [K.G.-S.] in a sailing class at Mr. Serven's expense. Mr. Serven's offers were genuine.

Ms. Gordon was unwilling to cooperate and engage in positive dialogue with Mr. Serven. Ms. Gordon's responses or lack thereof were examples of abusive use of conflict and perpetuated the parents' inability to discuss issues of import as

12

to [K.G.-S.]. Ms. Gordon's animosity towards Mr. Serven continues to get in the way of [K.G.-S.]'s best interests.

Ms. Gordon was focused on keeping a staunch position since the case was in litigation and on appeal, which appeared to be more to serve the benefit of the litigation than to figure out if there truly was a legitimate need for tutoring and/or counseling.

Ms. Gordon appeared to put up a roadblock on [K.G.-S.]'s learning at the outset of the 50/50 parenting plan with refusing to send [K.G.-S.]'s iPad with him for residential time with Mr. Serven during the remainder of the kindergarten year in 2021 when his entire education was homeschooling and not in-person school. The iPad was not an issue once [K.G.-S.] started first grade at [an elementary school], but Ms. Gordon continued her focus [K.G.-S.] 's need for outside tutoring to improve his reading and grades up through the 2024 trial.

Ms. Gordon kept disputed issues going. The birth certificate issue and Ms. Gordon's actions is an example of her continuing conflict unnecessarily.

CP at 738.

The court found that Gordon could have sought mediation, as provided by the 2021 parenting plan, if she thought K.G.-S. needed counseling or tutoring, but she did not do so. The court found Gordon's excuse, that she could not afford mediation, unpersuasive as she was underemployed but was an experienced server and realtor.

The trial court's final parenting plan stated that it preferred that K.G.-S. have a 50/50 week-on week-off schedule with both parents. However, because K.G.-S.'s school in Puyallup was 45 minutes away from Serven's home in Gig Harbor, the court determined it would be in K.G.-S.'s best interest to have more residential time during the school year with Gordon with the extra time spent on homework or tutoring.

Serven was to have residential time every other week from Wednesday after school to Monday school drop off. Then, on Wednesday of the off weeks, Serven would have an after-school dinner visit. Serven was to have at least ten overnights per month, and the court noted it was important to nurture and maintain the bond that had developed between Serven and K.G.-S.

13

During the summer, the court ordered Serven to have two consecutive weeks of residential time followed by Gordon having one week of residential time.

The court awarded Gordon sole decision-making on nonemergency healthcare and educational decisions. The court noted that "[Serven's] decision making is limited because of [Gordon's] abusive use of conflict finding and because [Gordon] is unable to cooperate with [Serven] and has too much animosity towards [Serven], which has not improved in three (3) years." CP at 753.

> B.     Child Support

The trial court's findings regarding child support included the following:

> 10.14 Ms. Gordon testified at the 2024 trial that all of the $3,500 in child support was deposited into "one pot" from which she paid household bills for herself, Wyatt, Bailey, and [K.G.-S.].
>                 . . . .
> 10.18 In the 2021 trial, Ms. Gordon requested a deviation so she could provide [K.G.-S.] with what [K.G.-S.] would be accustomed to receiving at Mr. Serven's residen[ce] given his wealth and resources. Yet, Ms. Gordon did not use any of the money intended for [K.G.-S.] for extras such as taking him to sporting events such as the Mariners or Seahawks, live theater performances, or even signing him up for youth sports.

CP at 747. The trial court imputed Gordon's net monthly income at $3,321 and set Serven's net monthly income at $66,897.70. The court found that an upward deviation was warranted and that $5,000 was reasonable under the totality of the circumstances. The court stated it was applying this amount retroactively to the March 2021 child support order, which meant Serven owed $54,000 in retroactive child support. The court commented that it was "frustrated that it is applying the child support retroactively, but it does not believe it has the discretion to apply it prospectively only. This Court is hindered and does not believe it has the authority based on the Court of Appeals' ruling to only apply the $5,000 prospectively." CP at 747.

14

V.     ATTORNEY FEES

After trial, to ascertain an appropriate attorney fee award, the court asked Gordon's counsel how many hours counsel had worked up to trial and through presentation. Counsel responded:

> I didn't add the total number of hours. What we're asking for is—Ms. Gordon has a balance with me of $54,941, so we're asking for that. And we're also asking for her to be reimbursed approximately $41,000, which she has paid both to my office and to experts that she consulted with in regards to this case.

RP (Feb. 9, 2024 presentation hearing) at 17. The court responded:

> I am not reimbursing fees for work that Ms. Gordon did. All right. I'm looking at your fees, your attorney fees, [counsel]. Your attorney fees, and those fees that we have not—that money has not already been advanced to you for, okay?

RP (Feb. 9, 2024 presentation hearing) at 18. Counsel then stated that her unpaid fees were $52,941. The trial court expressed concern when looking at Gordon's attorney's billings stating:

> [I]t's just the generalities of "trial prep" for certain number of hours and "trial prep" for certain number of hours. I'm a little more akin to seeing some more detail in terms of what you're doing for that—all of that time period. I don't want any attorney-client privileged information, but it seems like a significant amount of trial prep during—even during the course of the trial, you know, when you were prepared for trial on the 2nd. Yeah. Of course you're going to have to do some work when you go home. That's just the nature of the beast. But I'm looking at whether or not the $54,941 is a reasonable amount, you know, and is substantiated enough by—you know, by the billings.

RP (Feb. 9, 2024 presentation hearing) at 34. The court ordered Serven to pay $45,000 of Gordon's attorney fees for Gordon's counsel's time performed through February 9, 2024. No attorney fees were awarded from January 2 to January 8, as the trial was continued due only to counsel's illness. The trial court found that Gordon did not attend mediation in good faith because her attorney of record did not attend and ordered her attorney fee award offset by $500 for Serven's portion of the mediator's fee, $5,9450 for Serven's attorney fees in attending mediation, and $4,542.50 for work performed in responding to Gordon's counsel's notice of intent to withdraw and motion to continue trial right before trial. Therefore, Serven was responsible for $34,517 of Gordon's attorney fees.

VI.    MOTION FOR RECONSIDERATION

Serven filed a motion for reconsideration and asked for sole or joint decision-making on healthcare and education, to have child support awarded prospectively only, and in the alternative, to have retroactive child support placed into an account for post-secondary education support.  The trial court granted, in part, Serven's motion and awarded joint decision-making for non-emergent healthcare and education.

The court stated that "[t]his [was] in the child's best interest, despite the court's finding of abusive use of conflict by Ms. Gordon [and] her unwillingness to be cooperative."  CP at 45.  Gordon maintained sole decision-making regarding private school, tutoring, or counseling during her residential time.

The court also ordered that the $54,000 in retroactive child support be placed into a trust for K.G.-S.'s benefit.  Serven was to establish the trust with Gordon being the trustee.  Administrative expenses were to be paid from interest accrued in the trust.  Further, the trust was to be fully paid out by the time K.G.-S. reached the age of 18 or whenever child support stopped.  Gordon was not required "to provide receipts to [] Serven for child support payment[s] above the standard award."  CP at 45.  However, the court noted that Gordon had a fiduciary duty to use the funds for K.G.-S.'s benefit.

Gordon appeals, and Serven cross-appeals.

Additional facts relevant to the analysis are included below.

16

ANALYSIS

I.    NEW TRIAL

Gordon argues the trial court erred in holding a new trial on remand instead of just adopting her proposed parenting plan.  Specifically, she argues the law of the case doctrine prohibited the trial court from conducting a new trial.  We disagree.

A.    Legal Principles

We review a trial court's decision to grant or deny a new trial for an abuse of discretion. *In re Marriage of McCann*, 4 Wn. App. 2d 896, 915, 424 P.3d 234 (2018).  "A court abuses its discretion when an order is manifestly unreasonable or based on untenable grounds."  *Id.* at 915-16.

"It is well settled Washington law that a successor judge is without power to enter findings of fact on the basis of testimony heard by [their] predecessor."  *Tacoma Recycling Inc. v. Cap. Material Handling Co.*, 42 Wn. App. 439, 440, 711 P.2d 388 (1985) (following remand, successor judge was without authority to adopt the findings and conclusions of original judge that retired).

While no Washington case discusses remand to a successor judge other than in situations where the previous judge was no longer on the bench, we see no reason that the legal principle should not apply in situations where a case is remanded to a different judge.

Law of the case doctrine is derived "from both RAP 2.5(c)(2) and common law."  *Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005).  "In its most common form, the law of the case doctrine stands for the proposition that once there is an appellate holding enunciating a principle of law, that holding will be followed in subsequent stages of the same litigation."  *Id.*  The doctrine aims to "promote finality and efficiency in the judicial process."  *Id.*

B.     Analysis

In 2022 this court reversed the trial court's 2021 parenting plan, child support order and attorney fee award. *In re Parenting & Support of K.G.-S.*, No. 55619-7-II, (Wash. Ct. App. Dec. 13, 2022) (unpublished), http://www.courts.wa.gov/opinions/. This reversal was due, in part, to the trial court's failure to consider required statutory factors. *Id.* at 27-28. This court remanded "for proceedings consistent with [its] opinion" and directed that the proceedings be held before a different judge. *Id.* at 28. On remand, it had been over two years since the initial trial, K.G.-S. had been under a 50/50 residential schedule for that time, and the trial court needed updated information to make new findings of fact regarding what was in K.G.-S.'s best interests. Under the law of the case doctrine, nothing in this court's 2022 opinion barred the trial court from exercising its discretion to conduct a new trial on this basis. Accordingly, the trial court did not abuse its discretion in granting a new trial.

II.     PARENTING PLAN[3]

A.     Legal Principles

In Washington, "the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities." RCW 26.09.002. In developing and ordering a permanent parenting plan, the court exercises broad discretion. *In re Marriage of*

---

[3] Gordon assigns error to all of the findings of fact from the trial court's final parenting plan and then separately assigns error to twenty-four of the findings of fact from the order. Some of these findings of fact are favorable to Gordon and some individually span an entire page. Gordon does not specify which portions of the findings are erroneous and does not provide argumentation on each of these assignments of error. RAP 10.3(a)(6) requires that an appellate brief contain "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." When "a party presents no argument on a claimed assignment of error, that assignment of error is waived." *In re Det. of L.S.*, 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022). Accordingly, we address only the assignments of error for which Gordon provides argument.

*Kovacs*, 121 Wn.2d 795, 801, 854 P.2d 629 (1993). We review a trial court's parenting plan decisions for a manifest abuse of discretion. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). A manifest abuse of discretion occurs "when the trial court's 'decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" *Id.* (internal quotation marks omitted) (quoting *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014)).

"We do not review the trial court's credibility determinations or weigh conflicting evidence 'even though we may disagree with the trial court in either regard.'" *Id.* (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 740, 513 P.2d 831 (1973)). Appellate courts are extremely reluctant to disturb child placement decisions "[b]ecause the trial court hears evidence firsthand and has a unique opportunity to observe the witnesses." *In re Parenting & Support of C.T.*, 193 Wn. App. 427, 442, 378 P.3d 183 (2016).

We review the trial court's decision "to determine whether the findings are supported by substantial evidence and whether those findings support the conclusions of law." *In re Marriage of Akon*, 160 Wn. App. 48, 57, 248 P.3d 94 (2011). "Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true." *Id.* In determining the sufficiency of evidence, an appellate court need only consider evidence favorable to the prevailing party. *Id.* An appellate court may "review the entire record to determine whether the trial court's findings are supported by sufficient evidence." *In re Parentage of R.V.*, 22 Wn. App. 2d 300, 314, 511 P.3d 148 (2022).

"When making a substantial evidence challenge, '[t]he appellant must present argument to the court why specific findings of fact are not supported by the evidence and must cite to the record to support that argument' or they become verities on appeal." *Cantu v. Dep't of Lab. & Indus.*,

168 Wn. App. 14, 22, 277 P.3d 685 (2012) (quoting *Inland Foundry Co. v. Dep't of Lab. & Indus.*, 106 Wn. App. 333, 340, 24 P.3d 424 (2001)).

In determining residential arrangements, the trial court must consider the factors set forth in RCW 26.09.187(3)(a) to ascertain what is in the best interests of the child. *C.T.*, 193 Wn. App. at 442. Those factors are:

> (i) The relative strength, nature, and stability of the child's relationship with each parent;
> (ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
> (iii) Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(2), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
> (iv) The emotional needs and developmental level of the child;
> (v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
> (vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
> (vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.
> Factor (i) shall be given the greatest weight.

RCW 26.09.187(3)(a).

B.      Wishes of K.G.-S.

Gordon argues the court erred in not relying on K.G.-S.'s express wishes to reside with Gordon a certain number of days. We disagree.

Under RCW 26.09.187(3)(a)(vi), the trial court found that K.G.-S. was not sufficiently mature to express a reasoned and independent preference as to his residential schedule. Substantial evidence supported this finding.

20

For example, the GAL stated that simply articulating the schedule K.G.-S. wanted was not enough to show he was sufficiently mature to express a reasoned and independent preference because he might feel that way for reasons that might not be wholly supported.

K.G.-S. was eight years old. The GAL testified K.G.-S.'s descriptions of facts were at times, inconsistent and that his behavior exhibiting anxiety in his interview could have been because he was being untruthful and that he could have been coached to provide certain responses.

Evidence was also presented that he struggled with anxiety more generally and that he struggled academically. Further, Serven testified that he believed K.G.-S. felt responsible for Gordon's happiness, which could influence an expressed preference.

Accordingly, substantial evidence supports the trial court's finding that K.G.-S. was not sufficiently mature to express a reasoned and independent preference for his residential schedule based on his age, and the court did not abuse its discretion in not relying on his expressed preference.

C.      Court's Decision Not to Accept the GAL's Recommendation

Gordon argues the court erred in not relying on the GAL's recommendation. We disagree.

Under RCW 26.12.175(1)(b), when a court appoints a GAL in a family law matter, the GAL is statutorily obligated to "always represent the best interests of the child." The court must independently assess the GAL's evidence, just as it assesses the evidence presented by the parents. *In re Marriage of Bobbitt*, 135 Wn. App. 8, 28, 144 P.3d 306 (2006). A trial court is not bound by a GAL's recommendations. *In re Marriage of Magnuson*, 141 Wn. App. 347, 350, 170 P.3d 65 (2007). The trial court is also permitted to draw reasonable inferences from the evidence. *Adler v. Univ. Boat Mart, Inc.*, 63 Wn.2d 334, 338, 387 P.3d 509 (1963).

Here, the trial court was not bound by the GAL's recommendation and had discretion to reject a proposed parenting plan that it did not view to be in K.G.-S.'s best interests. The court found that "[p]ortions of the GAL report were lacking, and in some respects, showed a bias towards Ms. Gordon." CP at 736.

The court made specific findings about why it did not credit the GAL's recommendation. These were based, in part, on the fact that the GAL spent "significantly more time interviewing members of Ms. Gordon's household than Mr. Serven's household." CP at 736. The GAL did not interview Nora Serven one-on-one, and did not interview either of Serven's adult children. Serven's testimony regarding the GAL's behavior in his interview also supports the trial court's finding. Because the trial court's findings regarding the GAL's report were supported by substantial evidence and the court was not required to rely on the GAL's recommendation, the court did not abuse its discretion in rejecting it.

D.     Application of RCW 26.09.187(3)(a) factors

Gordon argues the trial court's final parenting plan was overall an abuse of discretion. Specifically, she argues that it was generally not in K.G.-S.'s best interests, in part, because K.G.-S. exhibits academic struggles since the 2021 parenting plan ordered 50/50 residential time. We disagree.

The trial court made findings regarding each of the statutory factors in RCW 26.09.187(3)(a).

Because Gordon does not provide argument regarding why most of the court's findings under RCW 26.09.187(a) are not supported by substantial evidence, they are verities on appeal. Further, for the reasons explained above, the court's finding under RCW 26.09.187(3)(a)(vi) that

K.G.-S. was not sufficiently mature to express a reasoned and independent preference as to his residential schedule is supported by substantial evidence.

Under RCW 26.09.187(i), the court found that K.G.-S. had developed a strong bond with Serven since the 50/50 parenting plan began in 2021 stating, "[t]here is so much evidence of the importance of the relationship that has developed between K.G.-S. and Mr. Serven in the last three years." CP at 740. The court also found that his bond with Gordon lasted much longer as she was his exclusive caregiver until age five.

The court stated that Serven had limited visitation with K.G.-S. up until the 50/50 parenting plan and that this was in part due to Gordon controlling the visits, but that Serven could have petitioned for a parenting plan earlier and did not do so. The court found that K.G.-S. needed both of his parents in his life. Given the bond that had developed between K.G.-S. and Serven, the court determined that K.G.-S. needed Serven consistently in his life just as he needed Gordon.

Regarding factor RCW 26.09.187(3)(a)(iii), the court found that both Gordon and Serven had past and potential future to successfully parent K.G.-S. This was based, again, in part, on the fact that Gordon was the primary parent up until the 50/50 parenting plan was entered in 2021. The court noted that Gordon controlled Serven's visits with K.G.-S. up until 2021, but that Serven could have petitioned for a parenting plan anytime up to that point. The court found that Serven stepped down from his role as president of his company and only worked 20 hours per week to parent K.G.-S. The court also noted that both Gordon and Serven had successfully parented two adult children.

Under RCW 26.09.187(3)(a)(iv), the trial court determined that K.G.-S. needed "nurturing boundaries, guidance, and [] direction from both parents." CP at 742. The court found that K.G.-S. loved having his father in his life and that this was important for K.G.-S.'s development. The

court found that having both parents in K.G.-S.'s life was important for his growth. The court noted that K.G.-S. was struggling academically and that his success in school should be a priority for Serven and Gordon going forward.

For factor RCW 26.09.187(3)(a)(v), the court found that K.G.-S. has a strong bond with his two adult half siblings, Bailey and Wyatt, at Gordon's home as well as his maternal grandparents. The court noted that Gordon testified K.G.-S. liked outdoor activities, including hiking and local jump zone activities.

The court also found that over the last three years K.G.-S. had developed a strong bond with Serven, Nora Serven, and her children. The court found that K.G.-S. had developed relationships with his adult half siblings, Jeff and Shawn, and that he regularly played with Jeff's children who were close in age to K.G.-S. K.G.-S. also regularly played with Nora Serven's daughter, who was closer in age to him than Wyatt or Bailey, and a neighbor. Serven signed K.G.-S. up for jujitsu in the Gig Harbor area and the court found that K.G.-S. had thrived in it and found success. The court noted that K.G.-S. should continue in jujitsu or some other martial arts.

The trial court considered factor RCW 26.09.187(3)(a)(vi), the wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule and found that both Gordon and Serven wanted to be the primary parent with sole decision-making. The court found that K.G.-S. was not sufficiently mature to express a reasoned and independent preference as to his residential schedule. The court noted that while the GAL placed a lot of reliance on K.G.-S.'s stated preference to spend a certain number of days at each parent's home, the court did not place as much reliance on that given K.G.-S.'s age.

Regarding RCW 26.09.187(3)(a)(vii), the court found that both parents had flexible schedules to accommodate K.G.-S.'s needs.

Based on these factors, the court stated it preferred that K.G.-S. have a 50/50 week-on week-off schedule with both parents. However, because K.G.-S.'s school in Puyallup was 45 minutes away from Serven's home in Gig Harbor, the court determined it would be in K.G.-S.'s best interest to have more residential time during the school year with Gordon with the extra time spent on homework or tutoring.

Serven was to have residential time every other week from Wednesday after school to Monday school drop off. Then, on Wednesday of the off weeks, Serven would have an after-school dinner visit. During the summer, the court ordered Serven to have two consecutive weeks of residential time followed by Gordon having one week of residential time. Serven was to have at least ten overnights per month.

Essentially, Gordon asks us to reweigh the evidence that was before the trial court, which we will not do. The trial court made extensive findings regarding K.G.-S.'s bond with Serven after the 2021 schedule was entered and considered the required statutory factors. The court explained why the schedule it chose was in K.G.-S.'s best interest and even allotted more time for K.G.-S. to spend doing homework and participating in tutoring. Accordingly, the court's legal conclusion that the residential schedule ordered was in K.G.-S.'s best interest flowed from its findings and was not an abuse of discretion.

E.      Findings under RCW 26.09.191(3)

Gordon argues the court erred in making findings against her under RCW 26.09.191(3)(e), (g). Specifically, she argues the court's findings do not meet the legal standard and that there was no detriment to the best interests of K.G.-S. We disagree.

Under RCW 26.09.191, the trial court has discretion to preclude or limit any provisions of the parenting plan if one of seven factors is present. "The trial court has discretion to determine whether the evidence presented meets the requirements of RCW 26.09.191." *In re Parenting & Support of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016).

Relevant here, RCW 26.09.191(4)(c)(v) provides that limitations may be imposed in a parenting plan when a parent engages in the "abusive use of conflict which creates the danger of serious damage to the child's psychological development." A finding of actual damage to the child's psychological development is not necessary to make a finding that a parent has engaged in the abusive use of conflict. *In re Marriage of Burrill*, 113 Wn. App. 863, 872, 56 P.3d 993 (2002). Further, RCW 26.09.191(4)(c)(vii) provides for limitations based on "[s]uch other factors or conduct as the court expressly finds adverse to the best interests of the child."

Here, the trial court found that Gordon's animosity toward Serven and inability to cooperate with him continually got in the way of K.G.-S.'s best interests. For example, while Gordon and Serven shared joint decision-making for K.G.-S., Gordon was unresponsive to Serven's offers and questions regarding tutoring and counseling, which the court found to be genuine.

The court found that Gordon was more concerned with keeping a staunch position to serve the purpose of litigation than with actually determining if K.G.-S. had a legitimate need for tutoring or counseling. This is evidenced by Gordon's focus on preserving e-mail chains, presumably for litigation purposes, instead of having dialogue regarding K.G.-S.'s needs. Gordon's animosity toward Serven getting in the way of K.G.-S.'s best interests is also evidenced by her refusal to respond to Serven's request to enroll K.G.-S. in a sailing class, her refusal to cooperate with Serven in providing an acceptable copy of K.G.-S.'s birth certificate, while K.G.-S. was being picked up,

26

and her refusal to send K.G.-S.'s iPad for school purposes when he first began having 50/50 residential time with Serven.

There was evidence presented at trial that K.G.-S. suffered from anxiety. The court could reasonably infer that Gordon's animosity and continual inability to cooperate with Serven exacerbated this anxiety and created a danger of serious damage to K.G.-S.'s psychological development. Accordingly, the trial court did not abuse its discretion in finding that Gordon engaged in abusive use of conflict.

F.  Joint Decision-Making

Gordon also argues the court erred by granting in part Serven's motion for reconsideration and awarding joint decision-making on education and non-emergent healthcare. We disagree.

"We review a trial court's decision granting or denying a motion for reconsideration for abuse of discretion." *Wiklem v. City of Camas*, 31 Wn. App. 2d 575, 593, 551 P.3d 1067 (2024), *review denied*, 4 Wn.3d 1002, 561 P.3d 739 (2025). CR 59(a) provides nine grounds for granting a motion for reconsideration including an:

> (8) Error in law occurring at the trial and objected to at the time by the party making the application; or
> (9) That substantial justice has not been done.

CR 59(a).[4]

Under RCW 26.09.187(2)(b)(iii), if one parent is opposed to mutual decision-making and that opposition is reasonable, the court must order sole decision-making. To determine whether opposition to mutual decision-making is reasonable, the court "shall consider the following criteria":

---

[4] These are the grounds on which Serven moved for reconsideration.

(i) The existence of a limitation under RCW 26.09.191 . . . ;
(ii) The history of participation of each parent in decision making in each of the areas in RCW 26.09.184(5)(a);
(iii) Whether the parents have a demonstrated ability and desire to cooperate with one another in decision making in each of the areas in RCW 26.09.184(5)(a); and
(iv) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

RCW 26.09.187(2)(c). "'[W]hen evidence of those factors is before the court and its oral opinion and written findings reflect consideration of the statutory elements, specific findings are not required on each factor.'" *C.T.*, 193 Wn. App. at 443 (quoting *In re Marriage of Murray,* 28 Wn. App. 187, 189, 622 P.2d 1288 (1981)).

Here, the trial court granted, in part, Serven's motion for reconsideration that requested joint decision-making on non-emergent healthcare and education. The court found that this was in K.G.-S.'s best interest "despite the court's finding of abusive use of conflict by Ms. Gordon [and] her unwillingness to cooperate." CP at 45. While the court did not orally articulate each factor under RCW 26.09.187(2)(c), evidence of these factors was before the court, and its written findings reflect consideration of these elements. The trial court considered the factors in RCW 26.09.187(2)(c) in determining its parenting plan and evidently did not find Gordon's opposition to mutual decision-making reasonable. Therefore, the court was not required to order sole decision-making and did not abuse its discretion.

III.     TRUST FOR BACK CHILD SUPPORT

Gordon argues the court erred in ordering that back child support be placed into a trust for K.G.-S. We disagree.

A.     Legal Principles

We review child support orders for an abuse of discretion. *State v. Burns*, 190 Wn. App. 826, 830, 363 P.3d 1 (2015). A trial court abuses its discretion when it bases its decision on

28

untenable grounds or reasons. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). "Substantial evidence must support the trial court's factual findings." *Burns*, 190 Wn. App. at 830. A decision is based on untenable grounds "if the factual findings are unsupported by the record." *Littlefield*, 133 Wn.2d at 47.

B.     Analysis

In family law matters, "the court has broad equitable powers." *In re Marriage of Morris*, 176 Wn. App. 893, 903, 309 P.3d 767 (2013). "'Having before it at the outset a cause cognizable in equity, the court retain[s] jurisdiction over the subject matter and the parties to be affected by its decree for all purposes—to administer justice among the parties according to law or equity.'" *In re Marriage of Langham*, 153 Wn.2d 553, 560, 106 P.3d 212 (2005) (quoting *Yount v. Indianola Beach Est.*, Inc., 63 Wn.2d 519, 524-25, 387 P.2d 975 (1964)). "Indeed, '[w]hen the equitable jurisdiction of the court is invoked . . . whatever relief the facts warrant will be granted.'" *Id.* (internal quotation marks omitted) (alterations in original) (quoting *Ronken v. Bd. of County Comm'rs of Snohomish County*, 89 Wn.2d 304, 313, 572 P.2d 1 (1977)).

The trial court had inherent equitable authority to order back child support be placed into a trust for the benefit of K.G.-S.[5] *See Bryant v. Bryant*, 68 Wn.2d 97, 99, 411 P.2d 428 (1966) (ordering creation of trust to provide for education expenses for children); *Abel v. Abel*, 47 Wn.2d 816, 821, 289 P.2d 724 (1955) (upholding trial court's "authority to impound property of the parties in a third person trustee for the benefit of the children").

---

[5] Pursuant to RCW 26.09.120(1) and RCW 26.23.050(2), Gordon argues that the trial court could only order Serven to make child support payments to the state registry, the payee, or "some other mechanism to which the parties both consent." Br. of Appellant at 60. However, RCW 26.09.120(1) and RCW 26.23.050(2) contain permissive language and do not on their face address the concept of a back child support obligation that arises on remand. Accordingly, we disagree that RCW 26.09.120(1) and RCW 26.23.050(2) limit the trial court's equitable authority in these circumstances.

Here, the trial court found the primary residential parent was using the child's support money as the sole source of support for herself and two adult children. This is evidenced by Gordon's testimony that she was using K.G.-S.'s child support money to fund her whole household, including paying down a credit card used for attorney fees instead of purchasing extras for K.G.-S. Under these circumstances, the trial court did not abuse its discretion in ordering the lump sum of retroactive child support be placed into a trust.

IV. TRIAL COURT ATTORNEY FEES

Gordon argues the trial court abused its discretion by not awarding her more attorney fees.[6] We disagree.

"We review a discretionary decision to award or deny attorney fees and the reasonableness of any attorney fee award for an abuse of discretion." *Winter v. Dep't of Soc. & Health Servs.*, 12 Wn. App. 2d 815, 836, 460 P.3d 667 (2020). Accordingly, "we reverse an award only if the trial court exercised its discretion on untenable grounds or for untenable reasons." *Collins v. Clark County Fire Dist. No. 5*, 155 Wn. App. 48, 98, 231 P.3d 1211 (2010).

As an initial matter, Gordon assigns error to attorney fee awards dated July 19, 2023, August 11, 2023, and December 8, 2023. However, Gordon only provides argument regarding the attorney fee award from February 9, 2024.

RAP 10.3(a)(6) requires that an appellate brief contain "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." When "a party presents no argument on a claimed assignment of error, that assignment

---

[6] Gordon does not specify an amount of attorney fees that the trial court should have awarded. Presumably Gordon argues that she should have been awarded all her requested attorney fees below, including the amount the court ordered to be offset against the fees Serven was ordered to pay.

of error is waived." *In re Det. of L.S.*, 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022). Because Gordon provides no argument regarding why the attorney fee awards from 2023 were erroneous, her assignments of error fail.

Regarding the attorney fee award from February 9, 2024, Gordon appears to argue the trial court should have awarded her the entire amount of her requested fees.

The trial court awarded Gordon $45,000 of her counsel's $54,941 requested fees. The court expressed concern over the lack of detail in her billing statements, including "trial prep" during trial and billings from January 2 to January 8 when the trial was continued only due to illness. RP (Feb. 9, 2024) at 34. The trial court offset this amount by $10,483 because Gordon's only counsel of record did not attend mediation that Serven had advanced money for Gordon's counsel to use in preparing for mediation. This amount included the mediator's fee, Serven's attorney fees for mediation, and his attorney fees for having to respond to the motion to withdraw and motion to continue trial just a few days before trial.

The trial court's grounds for awarding Gordon only some of her fees were not untenable. Therefore, the court did not abuse its discretion.

V.   CROSS-APPEAL

A.   Retroactive Child Support

Serven cross-appeals and argues the trial court abused its discretion when it concluded it had no discretion to order child support prospectively only. We disagree.

Pursuant to RCW 26.09.100, "[i]n a proceeding for . . . child support . . . the court shall order either or both parents owing a duty of support . . . to pay an amount determined under chapter 26.19 RCW." "[C]hild support is held in trust by the parents for the children and, hence, parents

have no right to waive their children's right to that support." *Hammack v. Hammack*, 114 Wn. App. 805, 808, 60 P.3d 663 (2003).

Here, this court concluded that the trial court abused its discretion and reversed its decision to set child support at $3,500. *K.G.-S.*, No. 55619-7-II, slip op. at 15. On remand, the trial court determined that the appropriate amount of child support was $5,000. Accordingly, under these facts, the court had no discretion to order child support prospectively only for that would create a situation where there was a period of time, while the case was on appeal, in which the child did not receive the entire amount of child support he was entitled to as of right. Therefore, the court was correct to conclude it had no discretion to award child support prospectively only.

B.      Sole decision-making

Serven conditionally argues that if this court reverses joint decision-making, it should award him sole decision-making. Because we affirm the trial court's decision ordering joint decision-making, we need not address this argument.

VI.     ATTORNEY FEES ON APPEAL

Gordon requests attorney fees on appeal pursuant to RAP 18.1 and RCW 26.09.140.

RAP 18.1 allows for an award of attorney fees if authorized by applicable law. RCW 26.09.140 provides for attorney fees on appeal. *In re Marriage of Raskob*, 183 Wn. App. 503, 520, 334 P.3d 30 (2014). After considering the financial resources of both parties, the court may award attorney fees. *In re Marriage of Tupper*, 15 Wn. App. 2d 796, 815, 478 P.3d 1132 (2020). In order to receive attorney fees on appeal, a party must file a financial affidavit with the court no later than 10 days before oral argument. RAP 18.1(c). "In exercising discretion under this statute, we consider the arguable merit of the issues on appeal and the parties' financial resources." *Raskob*, 183 Wn. App. at 520. If an appeal is "essentially factual in nature" and does "not present

any issue upon which reasonable minds could differ," it lacks arguable merit. *See In re Custody of Thompson*, 34 Wn. App. 643, 648, 663 P.3d 164 (1983).

Because of the financial disparity between the parties, we award Gordon some of her attorney fees. However, because the majority of Gordon's arguments are factual in nature and rest on the trial court's exercise of its discretion in determining a parenting plan, they have little arguable merit. Therefore, after our commissioner reviews the parties' attorney fee submissions for rate and hours billed, our commissioner shall apply a 50 percent deduction to the amount awarded.

## CONCLUSION

We affirm the trial court's final parenting plan, child support order, and attorney fee award.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J

We concur:

_____
Maxa, J.

_____
Che, J.